ACCEPTED
03-15-00516-CV
11051299
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/8/2016 6:27:41 PM
JEFFREY D. KYLE
CLERK

**No. 03-15-00516-CV**

In the Court of Appeals
For the Third Judicial District
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

6/8/2016 6:27:41 PM

JEFFREY D. KYLE
Clerk

**CANTU ENTERPRISES, LLC**
*Appellant,*

**v.**

**GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS, AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS**
*Appellees.*

On Appeal from the 53rd District Court, Travis County, Texas
Trial Court Cause No. D-1-GN-13-004369

**APPELLANT'S REPLY BRIEF**

Mark Eidman
Texas Bar No. 06496500
Mark.Eidman@RyanLawLLP.com

Doug Sigel
Texas Bar No. 18347650
Doug.Sigel@RyanLawLLP.com

Amy Wills
Texas Bar No. 24093379
Amy.Wills@RyanLawLLP.com

RYAN LAW FIRM, LLP
100 Congress Avenue, Suite 950
Austin, Texas  78701
512.459.6600 Telephone
512.459.6601 Facsimile

**Attorneys for Appellant**

June 8, 2016

# Table of Contents

                                                           Page

Table of Contents ................................................................................. i

Index of Authorities ............................................................................ iii

Index to Appendix ................................................................................v

Reply to Appellees' Statement Regarding Oral Argument .................................... vi

The Comptroller's arguments disregard the plain meaning of § 151.006(a)(1). ........1

The Comptroller's arguments do not refute the law and the evidence establishing that Cantu Enterprises is entitled to the sale for resale exemption. ...........................1

Reply to Statement of Facts .................................................................2

Reply to Standard of Review ................................................................8

Reply to Arguments ..........................................................................10

    I.    Subsection 151.006(a)(1) applies to transactions involving leases. ...........10

    II.   Cantu Enterprises' purchase of the aircraft qualifies for the sale for resale exemption under § 151.006(a)(1). ..................................................15

        A.   Cantu Enterprises purchased the aircraft for the purpose of reselling it. ..................................................................15

        B.   Subsection 151.006(a)(1) does not require the series of restrictions the Comptroller asserts apply here. .................................17

    III.  Cantu Enterprises purchased the aircraft in its normal course of business. ..................................................................20

        A.   There is no objective standard of "normal course of business." "Normal course of business" is tailored to the purchaser's business. ..................................................................20

        B.   The Comptroller is not permitted to question the manner of Cantu Enterprises' "normal course of business." .........................21

C.   Cantu Enterprises purchased the aircraft and leased it for diversification, risk management, and investment purposes — all of which show economic substance. ...............................................22

Prayer ...........................................................................................................25

Certificate of Compliance ...........................................................................26

Certificate of Service ...................................................................................26

# Index of Authorities

## Cases

*BMC Software Belgium, N.V. v. Marchand*,
  83 S.W.3d 789 (Tex. 2002)......................................................................17

*Coltec Indus., Inc. v. United States*,
  454 F.3d 1340 (Fed. Cir. 2006) ..........................................................24

*Combs v. Health Care Servs. Corp.*,
  401 S.W.3d 623 (Tex. 2013) ....................................................... passim

*Combs v. Newpark Res., Inc.*,
  422 S.W.3d 46 (Tex. App.—Austin 2013)..........................................11

*Combs v. Roark Amusement & Vending, L.P.*,
  422 S.W.3d 632 (Tex. 2013) ....................................................................8

*Day & Zimmerman v. Calvert*,
  519 S.W.2d 106 (Tex. 1975) ..................................................................21

*DTWC Corp. v. Combs*,
  400 S.W.3d 149 (Tex. App.—Austin 2013, no pet.)................................. 13, 20

*Frank Lyon Co. v. United States*,
  435 U.S. 561 (1978).................................................................................22

*GATX Terminals Corp. v. Rylander*,
  78 S.W.3d 630 (Tex. App.—Austin 2002, no pet.)...............................8

*Greater Houston P'ship v. Paxton*,
  468 S.W.3d 51 (Tex. 2015).....................................................................11

*Hanks v. GAB Bus. Servs., Inc.*,
  644 S.W.2d 707 (Tex. 1982) ....................................................... 18, 20

*In re City of Georgetown*,
  53 S.W.3d 328 (Tex. 2001).....................................................................11

*Matagorda Cnty. Appraisal Dist. v. Coastal Liquids Partners, L.P.*,
  165 S.W.3d 329 (Tex. 2005) ..................................................................11

*SSP Partners v. Gladstrong Invs. (USA) Corp.*,
275 S.W.3d 444 (Tex. 2009) ...............................................24

*Strayhorn v. Raytheon E-Systems*,
101 S.W.3d 558 (Tex. App.—Austin 2003, pet. denied) ...................................20

*Titan Transp., LP v. Combs*,
433 S.W.3d 625 (Tex. App.—Austin 2014, pet. denied) ...................................8

*Verizon Bus. Network Servs., Inc. v. Combs*,
No. 07-11-0025-CV, 2013 WL 1343530
(Tex. App.—Amarillo Apr. 3, 2013) ...................................8

**Statutes**

Tex. Bus. and Comm. Code § 2A.301 (West 2010) ...............................................22

Tex. Tax Code § 101.004 (West 2010) ...................................22

Tex. Tax Code § 151.005 (West 2010) .......................................... 13, 17

Tex. Tax Code § 151.006 (West 2010) ...................................14

Tex. Tax Code § 151.006(a)(1) (West 2010) .................................... passim

Tex. Tax Code § 151.006(a)(2) (West 2010) .................................... passim

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014) ...................................24

**Rules**

34 Tex. Admin. Code § 3.294 (West 2010) .......................................17

34 Tex. Admin. Code § 3.285 (West 2010) .......................................14

# Index of Appendix[1]

Reporter's Record – Volume 2 Excerpts

Reporter's Record – Volume 3 Excerpts

Reporter's Record – Volume 4 Excerpts

Reporter's Record – Volume 5 Excerpts

---

[1] The record excerpts cited in Appellant's Reply Brief are attached for the Court's convenience.

## Reply to Appellees' Statement Regarding Oral Argument

Appellant previously requested oral argument. Appellees state that oral argument is not necessary. After reviewing Appellees' Brief, Appellant withdraws its request for oral argument. Appellant has attempted to address all pertinent issues in its Reply Brief. If the Court feels that the issues need further discussion beyond the briefs, Appellant will participate in oral argument.

**The Comptroller's arguments disregard the plain meaning of § 151.006(a)(1)[2].**

The Comptroller's arguments disregard the **plain** meaning of

§ 151.006(a)(1). Subsection 151.006(a)(1) requires that the aircraft be purchased:

- **for the purpose of reselling the aircraft**

- **in the normal course of business**

- **in the form or condition in which the aircraft was acquired.**

Subsection 151.006(a)(1) **does not** require the series of extra-statutory

requirements that the Comptroller argues for in its Appellees' Brief.[3] It only

requires that the aircraft be purchased for the purpose of resale. The evidence

establishes that Cantu Enterprises purchased the aircraft for the purpose of

reselling it.[4]

**The Comptroller's arguments do not refute the law and the evidence
establishing that Cantu Enterprises is entitled to the sale for resale exemption.**

The real issue here is whether one of Cantu Enterprises' purposes in

purchasing the plane was to resell it.[5] Although the Comptroller cites a series of

sound-bite facts, it has not refuted the evidence establishing that Cantu Enterprises

purchased the aircraft for the purpose of resale.

---

[2] The Reporter's Record is referred to as "RR." The Reporter's Record reference includes the volume and page number. Unless noted otherwise, "Tax Code" and "subsection" refer to their respective provisions of the Texas Tax Code in effect during the period at issue. "Rule" refers to respective provisions of the Texas Administrative Code in effect during the period at issue.
[3] Discussed *infra*.
[4] *See* Appellant's Br. 5–11.
[5] *Id.* at 5–7.

In fact, the Comptroller's arguments fail for four reasons: (1) § 151.006(a)(1) includes lease transactions; (2) the evidentiary standard is by preponderance of the evidence, and the evidence showed that Cantu purchased the aircraft for the purpose of leasing it under § 151.006(a)(1); (3) Cantu Enterprises' lease of the aircraft was in its normal course of business; and (4) the economic substance doctrine does not apply, but even if it does, the aircraft purchase and lease had economic substance. Overall, the Comptroller has presented no solid legal argument or fact that would compel the Court to affirm the trial court's erroneous judgment.

## Reply to Statement of Facts

The Comptroller's description of the facts largely disregards the testimony and evidence presented. For example, the Comptroller's factual assertions do not reflect the true nature of the relationship between Cantu Enterprises and Cantu Consulting. These assertions also do not reflect the testimony that explains in detail why Cantu Enterprises operated the way it did.[6]

| Facts asserted by Comptroller | What the Record establishes |
| --- | --- |
| *"Cantu Consulting did not maintain separate Profit and Loss Statements, did not pay for Aircraft expenses, nor file federal income tax returns, nor provide an invoice under its own name."*[7] | • 3 RR 27 – Cantu Consulting paid for all operating expenses.<br>• 2 RR 46–47 – There was no legal need to generate separate profit and loss Statements.<br>• 3 RR 12 – Cantu Enterprises and |

---

[6] *See also id.* at 1–2.
[7] Appellees' Br. at 7, 30–31.

| | Cantu Consulting legally could not file separate federal tax returns. |
|---|---|
| | • 2 RR 35 – The invoices listed Cantu Enterprises as the lessor and Cantu Consulting as the lessee. |
| *"On October 9, 2009, the 'Non-Exclusive Aircraft Lease Agreement' . . . the only executed Aircraft Lease Agreement in this matter, was entered into by Cantu Enterprises and Cantu Consulting, which was signed by Mr. Cantu on behalf of both entities."*[8] | • 3 RR 22 – Cantu Enterprises and Cantu Consulting had an oral lease agreement in place before the executed written agreement. |
| *"In essence, Mr. Cantu and his related entities used the Aircraft for free."*[9] | • 5 RR 30 – Mr. Cantu testified: "When I use [the aircraft], they send me a bill; I pay for it." |
| *"In fact, Cantu Enterprises never leased its Aircraft to any person or entity unrelated to Mr. Cantu's personal or professional interests."*[10] | • 5 RR 13 – Mr. Cantu stated that he did not want the risk of leasing to "somebody that I'm not involved in." He also talked about reducing any risk of liability by not leasing to strangers. |
| *"Cantu Enterprises presented no evidence that Mr. and Mrs. Cantu paid for their personal use of the Aircraft pursuant to the Lease Agreement."*[11] | • 5 RR 30 – Mr. Cantu testified that he paid to use the aircraft. |
| *"In direct contrast to the terms of the Lease Agreement, the irrefutable documentary evidence demonstrates that it was Cantu Enterprises, and not Cantu Consulting, that paid for* | • 3 RR 27 – "In practicality, the money used to pay for the expenses was Cantu Consulting's money. Cantu Enterprises has very limited way to generate income. Cantu |

---

[8] *Id.* at 3, 8.
[9] *Id.* at 8.
[10] *Id.* at 9.
[11] *Id.* at 10.

| | |
|---|---|
| *all of the operating expenses for the Aircraft."*[12] | Consulting through their consulting business is the one who generated all the revenue. They're the ones who had the clients. So their money was deposited in the account and their money was used to pay the bills. It wasn't Cantu Enterprises' money." |
| *"Moreover, even though Mr. Cantu flew the Aircraft in his professional capacity to further his diverse business interests, he never paid for any of the flights on behalf of his 'organizations.'"*[13] | • 3 RR 27 – Cantu Consulting paid for operating expenses.<br>• 5 RR 30 – Mr. Cantu paid for his aircraft use. |
| *"Mr. Cantu candidly admits that the 'main objective in purchasing the aircraft' was for 'convenience and flexibility for . . . [his] companies to grow and to be able to do business quicker,' not the leasing of the Aircraft to generate revenue."*[14] | • 5 RR 30 – The Comptroller asked: "What was the objective of Cantu Enterprises, LLC in buying the aircraft?" Mr. Cantu answered: **"Strictly business, leasing."**<br>• 5 RR 19 – Mr. Cantu also stated that he wanted to increase his ventures in leasing and that is why he purchased the aircraft.[15] |
| *"The Time Share Agreement did not allow Cantu Consulting to collect lease revenue for any flights taken by Mr. Cantu, the 'Sharee' in this contract, that were not otherwise related to Cantu Consulting's business."*[16] | • 2 RR 85 – Cantu Consulting was not permitted to collect lease revenue under the time-share agreement: "Q: And there is no rental or lease rate above those operating expenses? A: **It's not permitted to be**. This tracks the language of the FAA part that limits the consideration that can be received on a time-share |

---

[12] *Id.*

[13] *Id.* at 10–11.

[14] *Id.* at 11–12.

[15] *See also* 2 RR 19–20, 22–23 (Bivens); 2 RR 105–08, 166–69 (Cantu); 3 RR 7–9, 4 RR 81–85 (Borrego).

[16] Appellees' Br. at 9.

| | |
|---|---|
| | agreement." |
| *The Comptroller focuses on the separate entity structure as evidence for sham transaction.*[17] | • 3 RR 8, 37 – Mr. Cantu's assets were held in separate entities "to protect his wealth and reduce his liability, his exposure." |
| *"Ms. Bivens testified that time-share agreements are very rigid and create a 'major limitation' on the revenue generated by Cantu Consulting.*[18] | • 2 RR 28–29 – But Ms. Bivens also testified that "the consulting arrangement would allow them to obtain more compensation" in answering the question "What possible reasons would they have for [entering into consulting arrangements rather than just time-share agreements]?" |
| *"Although Mr. Cantu has a marketing team for his numerous and diverse business interests, Mr. Cantu, through Cantu Enterprises or Cantu Consulting, has never, in any way, promoted or marketed the Aircraft for sale or lease at any price."*[19] | • 5 RR 13 – Mr. Cantu testified that he would not lease to strangers to reduce risk and liability. |
| *"Cantu Enterprises never made a profit."*[20] | • 3 RR 14 – Cantu Enterprises purchased the aircraft as a long-term investment and not for profit. The aircraft purchase created $4 million in equity.<br>• 3 RR 18–19 – Cantu Enterprises also purchased the aircraft as a way to diversify its business. |
| *"Mr. Cantu flew the Aircraft in his personal and professional capacity, including for his personal vacations* | • 5 RR 30 – Mr. Cantu paid for his aircraft use.<br>• 5 RR 21 – Mr. Cantu flew less than |

---

[17] *Id.* at 7.
[18] *Id.* at 9.
[19] *Id.*
[20] *Id.* at 10–11.

| | |
|---|---|
| *to California, Colorado, and Las Vegas.*"[21] | 10% of the time for personal reasons. |
| "*In fact, Mr. Cantu has 'priority' to use the Aircraft above anyone else that may have wanted or needed to use the Aircraft within his 'organization.'*"[22] | • 5 RR 21 – Mr. Cantu explained that he would schedule his flights "way ahead of time." |
| "*Mr. Cantu further testified that once the Aircraft was paid off, he intended on using it to 'fly around' and mark off his 'bucket list.'*"[23] | • Mr. Cantu did explain the main reasons for the aircraft purchase: <br> ○ 5 RR 30 – Q: "What was the objective of Cantu Enterprises, LLC in buying the aircraft?" A: "Strictly business, leasing." <br> ○ 5 RR 19 – "And then also I'm looking at other ventures in leasing." <br> ○ 3 RR 14 – Cantu Enterprises purchased the aircraft as a long-term investment and not for profit. The purchase created $4 million in equity. <br> ○ 3 RR 18–19 – Cantu Enterprises also purchased the aircraft as a way to diversify its business. |
| "*Cantu Enterprises' own witness further admitted that he was approached by unrelated third-parties wishing to rent the Aircraft, but Cantu Enterprises turned down this revenue each time.*"[24] | • 5 RR 13 – Mr. Cantu did not lease to strangers to reduce the risk of liability. |
| "*In addition, Cantu Enterprises has no assets other than the subject Aircraft, a bank account, and neither* | • 3 RR 8, 37 – The businesses and assets are structured as separate entities intentionally. The purpose is |

---

[21] *Id.* at 10.
[22] *Id.* at 9.
[23] *Id.* at 12.
[24] *Id.*

| | |
|---|---|
| *Cantu Enterprises nor Cantu Consulting have employees.*"[25] | "to protect [Mr. Cantu's] wealth and reduce his liability, his exposure." |
| *The Comptroller references what it considers Cantu Consulting's "exceptionally low rental rate."*[26] | • 2 RR 90 – This testimony is taken out of context. Ms. Bivens said that $600 would be below fair market rate if that was the <u>only</u> amount being paid. But she also said that Cantu Consulting was required to pay for all operating expenses. (*See also* 3 RR 27). |

---

[25] *Id.* at 7.
[26] *Id.* at 30.

## Reply to Standard of Review

Subsection 151.006(a)(1)'s language is <u>unambiguous</u> as recognized by the Texas Supreme Court.[27] The Comptroller agrees that § 151.006(a)(1) is unambiguous.[28] Because § 151.006(a)(1)'s language is unambiguous, as explained in Appellant's Brief, statutory construction rules do not apply.[29] Thus, the Comptroller's interpretation should receive no deference and strict construction should not apply. The Court should only apply § 151.006(a)(1)'s plain language.

Further, no deference should be given to the trial court's findings because they result from an improper construction of § 151.006(a)(1) and thus are immaterial and erroneous.[30] Therefore, the Comptroller's reliance on the findings of fact should be disregarded.

Finally, because this is a tax refund case, Cantu Enterprises only had to prove by a preponderance of the evidence that it is entitled to a refund.[31] A

---

[27] *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 627 (Tex. 2013) (recognizing that 151.006(a)(1) is unambiguous).

[28] Appellees' Br. at 20.

[29] Courts "give such statutes their plain meaning without resort to rules of construction or extrinsic aids." *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013). Strict construction of a tax provision, including an exemption, is thus inappropriate if the statute is unambiguous.

[30] Appellant's Br. at 3–4. *See also Titan Transp., LP v. Combs*, 433 S.W.3d 625, 642 (Tex. App.—Austin 2014, pet. denied).

[31] *Verizon Bus. Network Servs., Inc. v. Combs*, No. 07-11-0025-CV, 2013 WL 1343530, at *4 (Tex. App.—Amarillo Apr. 3, 2013) (citing *GATX Terminals Corp. v. Rylander*, 78 S.W.3d 630, 634, 636 (Tex. App.—Austin 2002, no pet.).

preponderance of the evidence proved Cantu Enterprises' entitlement to the resale

exemption under § 151.006(a)(1).[32]

---

[32] *See* Appellant's Br. at 1–11.

**Reply to Arguments**

## I.     Subsection 151.006(a)(1) applies to transactions involving leases.

The Comptroller asserts that if § 151.006(a)(1) and § 151.006(a)(2) both include leases of tangible personal property, the provisions would be "synonymous," which would go against the Legislature's intent.[33] The Comptroller further asserts that because the Legislature intended the provisions to be distinct, § 151.006(a)(1) cannot apply to transactions involving leases.[34] As a result, the Comptroller concludes that if both provisions are read to apply to lease transactions, § 151.006(a)(1) would render § 151.006(a)(2) "meaningless or superfluous."[35] Relying on these arguments, the Comptroller argues that § 151.006(a)(1) does not apply in this case because Cantu Enterprises leased the aircraft to Cantu Consulting, and § 151.006(a)(1) does not apply to lease transactions.[36]

However, §§ 151.006(a)(1) and (a)(2) merely overlap in certain respects. Both provisions apply to lease transactions. But each provision has other distinct requirements.

---

[33] Appellees' Br. at 22.
[34] *Id.* at 23–24.
[35] *Id.* at 24.
[36] *Id.* at 20.

It is well-established that the Legislature chooses specific words, and these words may apply in more than one provision for emphasis or caution.[37] Texas courts have also recognized that statutory provisions may overlap.[38] In addition, Texas courts have recognized that overlapping provisions can be precisely what the Legislature intended and do not necessarily transform well-thought-out statutory provisions into mere surplusage or meaningless terms.[39] Thus, both §§ 151.006(a)(1) and (a)(2) may both apply to leases contrary to the Comptroller's assertions otherwise.[40]

More importantly, the Legislature specifically chose to include lease transactions in both subsections (a)(1) and (a)(2) when it defined "sale" in the Tax Code. Under § 151.005(2), a "sale" is defined to include a "lease." Therefore, § 151.006(a)(1)'s reference to "sale" includes purchasing an item for the purpose of leasing it.[41] Even the Texas Supreme Court has recognized this.[42] The

---

[37] *In re City of Georgetown,* 53 S.W.3d 328, 336 (Tex. 2001) (noting that statutory redundancies may mean that "the Legislature repeated itself out of an abundance of caution, for emphasis, or both").

[38] *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 54 (Tex. App.—Austin 2013) (recognizing that separately listed terms does not render them mutually exclusive) (citing *Matagorda Cnty. Appraisal Dist. v. Coastal Liquids Partners, L.P.*, 165 S.W.3d 329, 334–35 (Tex. 2005) (noting that categories listed separately in statute can still overlap)).

[39] *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 66 (Tex. 2015).

[40] *Id.* at 22.

[41] Appellant's Br. at 7.

[42] *Health Care Servs. Corp.*, 401 S.W.3d at 632.

Comptroller's assertion that "sale" under § 151.006(a)(1) does not include "lease" is simply unfounded.[43]

Further, the fact that both subsections (a)(1) and (a)(2) apply to lease transactions does not mean that the sections "collapse and subsume" each other as the Comptroller asserts.[44] Each provision has distinct requirements for its separate definition of "sale for resale":

| "Sale for Resale" Definition Requirements | |
|---|---|
| § 151.006(a)(1) | § 151.006(a)(2) |
| A sale of tangible personal property | A sale of tangible personal property |
| Purpose for resale | Sole purpose for leasing or renting only |
| In the normal course of business | In the normal course of business |
| In the form or condition in which it is acquired | To another person |
| Or as an attachment to or integral part of other tangible personal property or taxable service | But not if incidental to the leasing or renting of real estate |

As shown by the table, § 151.006(a)(1) and § 151.006(a)(2) have different roles. Subsection 151.006(a)(1) applies to tangible personal property acquired for resale. This does not have to be the "sole" purpose as the Legislature did not

---

[43] *See* Appellant's Br. at 7–8.
[44] Appellees' Br. at 22.

include that language.[45] Subsection 151.006(a)(1) also only applies to tangible personal property that is sold in the form it is acquired or that is integral to other tangible personal property or a taxable service. For example, § 151.006(a)(1) applies to hotel consumables such as soap, shampoo, and conditioner.[46] These are purchased for the purpose of resale to the customer and are in the same form as acquired.

Subsection 151.006(a)(2), on the other hand, only applies to property acquired <u>for the sole purpose of leasing or renting it</u>. The Legislature specifically restricted the definition of "sale" by permitting only lease and rental transactions to qualify.[47] Subsection 151.006(a)(2) also differs from § 151.006(a)(1) as it does not require that the tangible personal property be in the same condition it is acquired. Subsection 151.006(a)(2) will not apply if the tangible personal property leased or rented is incidental to the renting or leasing of real estate — § 151.006(a)(1) has no such limitation. These differences make §§ 151.006(a)(1) and (a)(2) unique. For example, the hotel consumable example above would not qualify for the (a)(1) exemption if the consumables were somehow changed before being resold. But, assuming all other requirements are met, it would still qualify under (a)(2). Likewise, if the hotel consumables were available for purchase, lease, or rental,

---

[45] If the Legislature had intended resale to the be "sole" purpose of acquiring the tangible personal property, then it would have stated so as it did in § 151.006(a)(2).
[46] *DTWC Corp. v. Combs*, 400 S.W.3d 149, 152 (Tex. App.—Austin 2013, no pet.).
[47] *Cf.* Tex. Tax Code § 151.005(2).

(assuming all other factors are met) it would qualify for the exemption under (a)(1) but not (a)(2) as (a)(2) requires that the sole purpose of the purchase is to lease or rent the tangible personal property.

Because the definitions are <u>distinct</u>, the inclusion of lease transactions in each provision does not render the provisions identical. Instead, the distinct provisions mean subsections (a)(1) and (a)(2) <u>cannot</u> "collapse and subsume" each other.[48] Therefore, recognizing that both definitions include lease transactions does not render one or the other meaningless or superfluous contrary to the Comptroller's arguments.[49]

Further, the Comptroller's reliance on Rule 3.285 does not change this.[50] Rule 3.285 does not distinguish selling and leasing. The Rule, in fact, references both terms interchangeably.[51] To the extent the Comptroller asserts that the Rule and § 151.006 show a "clear" intent to distinguish "sale" and "lease," those allegations are unfounded and contrary to the Tax Code and the Comptroller Rule. Therefore, the Court should disregard this interpretation.[52]

---

[48] Appellees' Br. at 22.
[49] *Id.* at 22–23.
[50] *Id.* at 23.
[51] *See* 34 Tex. Admin Code § 3.285(b) (using "resell, lease, or rent" interchangeably when discussing a resale transaction).
[52] *Health Care Servs. Corp.*, 401 S.W.3d at 630.

## II. Cantu Enterprises' purchase of the aircraft qualifies for the sale for resale exemption under § 151.006(a)(1).

Subsection 151.006(a)(2) is not at issue because Cantu Enterprises is entitled to the resale exemption under § 151.006(a)(1) as discussed above. All the points the Comptroller raises discussing § 151.006(a)(2) are thus irrelevant.[53] Although § 151.006(a)(2) requires "sole purpose," § 151.006(a)(1) only requires resale as a "purpose."[54] The evidence, therefore, <u>does not</u> have to show that Cantu Enterprises purchased the aircraft *solely* to resell it.

The evidence in the trial court conclusively established that Cantu Enterprises' purchase of the aircraft qualified for the sale for resale exemption under § 151.006(a)(1): Cantu Enterprises purchased the aircraft (1) for the purpose of reselling it,[55] (2) in the normal course of business,[56] and (3) in the form or condition in which the aircraft was acquired.[57]

### A. Cantu Enterprises purchased the aircraft for the purpose of reselling it.

As discussed in detail in Appellant's Brief,[58] Cantu Enterprises purchased the aircraft for the purpose of reselling it. (2 RR 19–20, 22–23 (Bivens); 2 RR 105–08, 166–69 (Cantu); 3 RR 7–9, 4 RR 81–85 (Borrego)). Although the

---

[53] *See* Appellees' Br. at 5–8.

[54] Apellant's Br. at 5–7. *See also Health Care Servs. Corp.*, 401 S.W.3d at 627 (concluding that § 151.006(a)(1) had no "primary" purpose requirement).

[55] Appellant's Br. at 5–9.

[56] *Id.* at 8–11.

[57] The Comptroller does not contest (3) so we do not address it here but refer the Court to Appellant's Brief at page 11.

[58] Appellant's Br. at 1–11.

Comptroller cites certain record evidence as support, as stated in the above Reply to the Statement of Facts, those facts are taken out of context while other facts are ignored.[59] For example, the Comptroller relies on the lack of separate profit and loss statements and the lack of separate federal income tax returns to assert that Cantu Enterprises' transaction with Cantu Consulting was a "sham transaction."[60] But the testimony established that there was no legal need for Cantu Enterprises and Cantu Consulting to generate separate profit and loss statements. (2 RR 46–47). Further, the entities, as disregarded entities, were not permitted to file separate federal income tax reports. (3 RR 12).

Other facts[61] that the Comptroller asserts and relies on include *inter alia* that Mr. Cantu and his entities used the aircraft for free; that the invoices were not under Cantu Consulting's name, and that Mr. Cantu's purpose for purchasing the aircraft was not for leasing it.[62] But the evidence disproves or clarifies all these facts: As testified to, the use of aircraft was paid for (5 RR 30; 3 RR 27), the invoices listed Cantu Consulting as the lessee (2 RR 35), and Mr. Cantu purchased the aircraft to lease it (5 RR 30; 5 RR 19).[63] Thus, the evidence established that

---

[59] *See* Reply to Statement of Facts *supra*; *see also* Appellant's Br. at 1–2.
[60] Appellees' Br. at 36.
[61] To avoid being repetitive, all misconstrued facts relied on by the Comptroller are addressed in the Reply to the Statement of Facts.
[62] Appellees' Br. at 34.
[63] The Comptroller cites testimony in 5 RR 20–21 and 4 RR 52 as evidence that the aircraft use was not paid for. But the witness said that he didn't know if it was paid for. (4 RR 52) ("Q. And would Mr. Cantu ever personally pay for those flights? A. I don't know.").

Cantu Enterprises purchased the aircraft for the purpose of reselling it. The

Comptroller's assertions do not overcome this conclusive evidence.

**B.      Subsection 151.006(a)(1) does not require the series of restrictions the Comptroller asserts apply here.**

Although § 151.006(a)(1) requires that one of the purposes Cantu

Enterprises purchases the aircraft is to resell it,[64] it **does not** require:

- *A sale of tangible personal property that does not involve a lease transaction*[65] – As stated § 151.005(2) defines "sale" to include a "lease."[66]

- *The transacting entities be unaffiliated*[67] – Importantly, Texas law presumes that two separate entities are distinct entities.[68] Further, separate entities can enter into leasing agreements.[69] If the Comptroller's interpretation applied, then no transaction between related entities would qualify for the sale for resale exemption.

- *A transfer of title and possession*[70] – Comptroller Rule 3.294(a)(2) defines "lease" as a transaction where possession but not title is transferred. Thus, a "sale," as defined by § 151.005(2), does not require a transfer of title.

- *Maintaining separate profit and loss statements*[71] – Federal and state law did not require that Cantu Enterprises and Cantu Consulting maintain separate profit and loss statements. (2 RR 46–47).

---

[64] *See* Appellant's Br. at 5–7.

[65] Appellees' Br. at 7.

[66] *See also Health Care Servs. Corp.*, 401 S.W.3d at 632.

[67] Appellees' Br. at 19.

[68] *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002).

[69] The evidence established that the businesses are structured as distinct entities to protect against liability by reducing exposure. (3 RR 8).

[70] Appellees' Br. at 7, 11.

[71] *Id.* at 36.

**Appellant's Reply Brief – Page 17**

- *Strict adherence to the parties' written agreement*[72] – Cantu Enterprises and Consulting do not have to follow their agreement word for word. Parties can amend agreements and consent to the amendments with their actions. Any actions that were different from the agreement were consented to. The parties have the right to change their agreement as necessary.[73]

- *Promoting or marketing the aircraft to unknown third parties*[74] – There is no statutory requirement that the aircraft be marketed to the general public. Further, the testimony explained that the aircraft was not leased to unknown third parties to avoid unnecessary risk and exposure to liability. (5 RR 13).

- *A ban on all personal use*[75] – Subsection 151.006(a)(1) does not ban all personal use. It only requires that one purpose of the aircraft purchase is to resell it. The evidence established that Cantu Enterprises purchased the aircraft to resell it. (5 RR 19, 30). Mr. Cantu's use of the aircraft for professional and personal purposes does not negate that purpose. Despite de minimus use for personal trips (less than 10% of the use), which Mr. Cantu testified that he paid for, Cantu Enterprises purchased the aircraft to lease it out as a business venture. (5 RR 21, 30).

- *Making a profit*[76] – Cantu Enterprises did not need to make a profit to qualify for the exemption. Cantu Enterprises did not purchase the aircraft to make a profit but instead purchased it as an investment and to diversify its business. (3 RR 14, 18–19). [77]

---

[72] *Id.* at 37–38.

[73] *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982) ("A party who elects to treat a contract as continuing when an agreement is not followed has waived any action for breach.").

[74] Appellees' Br. at 9.

[75] *Id.* at 26.

[76] *Id.* at 27–28.

[77] The testimony also explains that Cantu Enterprises entered into consulting arrangements versus time-share agreements because Cantu Enterprises could get more compensation that way. (2 RR 28–29).

- *A certain amount of assets*[78] – The Comptroller considers Cantu Enterprises' lack of assets an important fact to establish that this was not a valid resale transaction. But there is no requirement under § 151.006(a)(1) that Cantu Enterprises have a certain number of assets for qualify for the exemption.[79]

These other extra-statutory requirements that the Comptroller imposes are irrelevant to whether Cantu Enterprises' purchase meets § 151.006(a)(1)'s requirements. Overall, the Comptroller points to testimony suggesting various purposes for Cantu Enterprises' purchase of the aircraft. However, these stated purposes sidestep the reality that, under § 151.006(a)(1)'s plain language, Cantu Enterprises <u>only needs to establish resale as one of the purposes</u> for the aircraft purchase. Thus, the Court should disregard the Comptroller's extra-statutory requirements.

Further, in pointing to testimony reflecting these various ancillary purposes, the Comptroller glosses over the main purpose for Cantu Enterprises' aircraft purchase — to resell it to Cantu Consulting. (*See* 2 RR 19–20, 22–23 (Bivens); 2 RR 105–08, 166–69 (Cantu); 3 RR 7–9, 4 RR 81–85 (Borrego)).[80] Because Cantu Enterprises purchased the aircraft to resell it, and the evidence established this,[81] Cantu Enterprises is entitled to the sale for resale exemption under § 151.006(a)(1).

---

[78] Appellees' Br. at 7.
[79] Mr. Borrego testified that his businesses and assets are structured as separate entities "to protect his wealth and reduce his liability, his exposure." (3 RR 8).
[80] Appellant's Br. at 1–11.
[81] *Id.*

## III. Cantu Enterprises purchased the aircraft in its normal course of business.

### A. There is no objective standard of "normal course of business." "Normal course of business" is tailored to the <u>purchaser's</u> business.

The Comptroller asserts that Cantu Enterprises did not act in the normal course of business by referencing a series of characteristics, such as not making a profit or entering into the time-share agreement, to show "normal course of business."[82] But the Comptroller cites no supporting authority, no definition, and no term of art for "normal course of business" to show that the term includes characteristics it references.[83] But "normal course of business" does not refer to arbitrary requirements set by the Comptroller.

"Normal course of business" refers to the <u>purchaser's</u> normal course of business.[84] Notably, the Comptroller does not challenge the Texas authority that establishes this.[85]

---

[82] Appellees' Br. at 27, 29. The Comptroller also relies on actions that it asserts are "material" breaches of the time-share agreement. *Id.* at 30. The issue is that there were no material breaches. Under basic contract law, a party who elects to treat a contract as continuing when an agreement is not followed has waived any action for breach. *Hanks*, 644 S.W.2d at 708. Because the parties continued in their agreement as amended by their actions, there was no breach. The Comptroller also relies on testimony saying that $600 rental rate was below the fair market value as additional evidence. But the Comptroller ignores the testimony that states Cantu Consulting was also required to pay for all operating expenses. (2 RR 90).

[83] Appellees' Br. at 28–29.

[84] *See* Appellant's Br. at 8–11.

[85] *See DTWC Corp.*, 400 S.W.3d at 155; *Strayhorn v. Raytheon E-Systems*, 101 S.W.3d 558, 567 (Tex. App.—Austin 2003, pet. denied).

Further, the Comptroller did not present evidence or authority to dispute the evidence that Cantu Enterprises was acting in its normal course of business when it purchased the aircraft. The evidence conclusively established that the aircraft purchase and lease agreement structure was tailored to Cantu Enterprises' business needs. (2 RR 15–16, 23–28, 14–49). The evidence also showed the gains, benefits, and advantages achieved by the aircraft purchase (3 RR 32–33) and that, as an investment, the purchase was a "success." (3 RR 33). Imposing the Comptroller's arbitrary "normal course of business" requirements will re-write the statute under the guise of interpreting it, which Texas courts are not permitted to do.[86]

### B. The Comptroller is not permitted to question the manner of Cantu Enterprises' "normal course of business."

Further, although the Comptroller cites *Day & Zimmerman v. Calvert*[87] to assert that the terms of a contract can be examined,[88] looking to the terms of a contract is not at issue here. Instead, the issue is that the Comptroller questions the manner and conditions of an executed agreement to assert that the resale exemption does not apply. But *Day & Zimmerman* established that the manner and conditions of an agreement are not open for debate.[89] Thus, the Comptroller has no basis for questioning, for example, the parties' actions under the agreement or how Cantu Enterprises chooses to conduct its business generally. The fact is "a lease

---

[86] *Health Care Servs.*, 401 S.W.3d at 627 n.8.
[87] 519 S.W.2d 106, 108 (Tex. 1975). *See also* Appellant's Br. at 10–11.
[88] Appellees' Br. at 29.
[89] 519 S.W.2d at 110.

contract is effective and enforceable <u>according to its terms between the parties</u>, against purchasers of the goods and against creditors of the parties."[90] Thus, the Comptroller cannot question Cantu Enterprises' business dealings or set arbitrary "business standards" to deny Cantu Enterprises the sale for resale exemption.

### C. Cantu Enterprises purchased the aircraft and leased it for diversification, risk management, and investment purposes — all of which show economic substance.

The economic substance doctrine does not apply in this case.[91] But even if the doctrine applies, the evidence established that the transaction had economic substance.[92] Cantu Enterprises purchased the aircraft for the purpose of leasing it.[93] By purchasing and leasing the aircraft, Cantu Enterprises managed risk, diversified its business, and produced a long-term investment. (3 RR 8, 13–14, 18–19; 5 RR 13–14). Therefore, the transaction is not a sham as it has independent economic benefits.[94]

The Comptroller relies on *Frank Lyon Co. v. United States*,[95] which neither applies nor changes this result. Unlike the parties in *Frank Lyon Co.*, and contrary to the Comptroller's assertions, Cantu Enterprises did not simply "draw up papers"

---

[90] Tex. Bus. and Comm. Code § 2A.301 (emphasis added).
[91] *See* Appellant's Br. at 16–20. The Tax Code repeals common law when it conflicts with a statute's plain language. Tex. Tax. Code § 101.004. The economic substance doctrine is a federal common law doctrine that has not been adopted in the Tax Code.
[92] All the cases cited by the Comptroller are inapplicable because the transaction here, unlike the cases relied on by the Comptroller, has economic substance. *Cf.* Appellees' Br. at 32.
[93] *See* Appellant's Br. at 5–8.
[94] *Id.* at 16–20.
[95] 435 U.S. 561, 573 (1978).

with Cantu Consulting. Instead, beyond entering into a valid lease agreement with Cantu Enterprises, Cantu Consulting made lease payments (2 RR 154), entered into time-share agreements (2 RR 19), operated the aircraft (2 RR 21), and paid for operating expenses (3 RR 27). None of these transactions would have occurred if the parties had merely drawn up papers.

The Comptroller's assertions about Cantu Enterprises' reliance on *Health Care Services Corp.* also do not apply and do not change the fact that Cantu Enterprises' transaction had economic substance.[96] As stated in Appellant's Brief,[97] *Health Care Services* establishes that extra-statutory requirements cannot be imposed in the name of "economic substance"— as the Comptroller is doing here:

> However, we also made clear that if the statute does "not impose, either explicitly or implicitly," the "extra-statutory requirement" urged by the Comptroller, "we decline to engraft one-revising the statute under the guise of interpreting it." **We did not suggest that, in the guise of considering the economic realities or essence of the transaction, courts were authorized to impose an entirely new requirement for a tax exemption that simply is not found in the language of the statutory exemption.**[98]

The Comptroller disregards the undisputed evidence showing that the purchase of the aircraft and resale transaction's purposes were to manage risk, diversify assets, and create a long-term investment. (3 RR 8, 13–14, 18–19; 5 RR

---

[96] Appellees' Br. at 33 (saying Cantu Enterprises asserts that economic realities cannot be considered, citing *Health Care Services Corp.*).
[97] Appellant's Br. at 14–16.
[98] 401 S.W.3d at 627 n.8 (emphasis added). *See also* Appellant's Br. at 15.

13–14).[99] The Comptroller also cites no authority to establish that entering into an agreement for these business reasons is not sufficient to establish economic substance.

Further, even though the Comptroller asserts that this was a "sham transaction" that was not "arms-length" and the parties did not observe "corporate formalities," the Comptroller provides no authority to establish the meaning or even relevance of these terms. Regardless, <u>these terms or characteristics are not the test for "purpose."</u> For example, the Comptroller focuses on the fact that Cantu Consulting and Cantu Enterprises have similar ownership, but does not once address why distinct corporate entities with similar ownership cannot enter into a valid leasing transaction. The fact that the entities are related is irrelevant. Cantu Consulting is an entity wholly separate from its owner, Cantu Enterprises. Texas Courts "have never held corporations liable for each other's obligation merely because of centralized control, mutual purposes, and shared finances."[100] Under the Comptroller's interpretation, all leasing transactions between separate corporate entities with similar ownership would be "sham transactions."[101] This approach is

---

[99] *See also* Appellant's Br. at 14–16.

[100] *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 445 (Tex. 2009); *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1358 (Fed. Cir. 2006) (recognizing that minimization of liability is a bona fide business purpose).

[101] The definition of sham transactions says nothing about related entities entering into a contract. *Black's Law Dictionary* 1585 (10th ed. 2014) ("An agreement or exchange that has no independent economic benefit or business purpose and is entered into solely to create a tax

obviously unreasonable. In sum, the evidence conclusively proved that Cantu Enterprises' lease transaction had economic substance. The Comptroller did not establish lack of economic substance.

## Prayer

Cantu Enterprises asks the Court to reverse the trial court's denial of the sale for resale exemption and render judgment that Cantu Enterprises is entitled to a refund of the amount paid under protest plus statutory interest.

Respectfully submitted,

 /s/ Doug Sigel
Mark Eidman
Texas Bar No. 06496500
Mark.Eidman@ryanlawllp.com
Doug Sigel
Texas Bar No. 18347650
Doug.Sigel@ryanlawllp.com
Amy Wills
Texas Bar No. 24093379
Amy.Wills@ryanlawllp.com
Ryan Law Firm, LLP
100 Congress Avenue, Suite 950
Austin, Texas 78701
Telephone: (512) 459-6600
Facsimile: (512) 459-6601

Attorneys for Appellant

---

advantage (such as a deduction for a business loss). • The Internal Revenue Service is entitled to ignore the purported tax benefits of a sham transaction.").

## Certificate of Compliance

This computer-generated document created in Microsoft Word complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 5906 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1). In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

     /s/ Doug Sigel
     Doug Sigel

## Certificate of Service

I certify that a copy of the foregoing Appellant's Reply Brief was served on Appellees, Glenn Hegar and Ken Paxton, through counsel of record, Jack Hohengarten and Shannon Ryman, Office of the Attorney General, P.O. Box 12548, Austin, Texas, 78711-2548, Jack.Hohengarten@texasattorneygeneral.gov and Shannon.Ryman@texasattorneygeneral.gov, by electronic service through efile.txcourts.gov on June 8, 2016.

     /s/ Doug Sigel
     Doug Sigel

# Reporter's Record Volume 2 Reply Reference

2 RR 14–49

2 RR 15–16

2 RR 19–20

2 RR 21

2 RR 22–23

2 RR 23–28

2 RR 28–29

2 RR 35

2 RR 46–47

2 RR 85

2 RR 90

2 RR 105–08

2 RR 154

2 RR 166–69

that time.

Q. Can you walk us through some of the steps that you worked with Mr. Levy on?

A. In putting the structure in place, detailing the structure, why that structure was necessary, and the liability protection it would afford, and also the FAA regulatory issues, and putting the lease agreements in place, and also registering for a Texas sales tax account.

Q. Did Enterprises already exist when the aircraft at issue was purchased?

A. Yes, it did.

Q. Did Enterprises own any previous aircraft?

A. Yes, it did.

Q. Did Advocate assist Enterprises with its purchase of the first aircraft?

A. Yes.

Q. And what was the purpose of Enterprises purchasing the second aircraft, the aircraft at issue?

MS. SAMS: Objection --

A. This aircraft was purchased --

THE COURT: Excuse me. Once a lawyer stands we have to stop.

MS. SAMS: Objection, foundation, Your Honor.

THE COURT: You have to establish how she would know what the purpose was from firsthand -- some firsthand basis, not what somebody told her. I'm not sure you'd be able to do that with this witness, but go ahead.

Q. (BY MS. GOLDBERG) Did you work with Enterprises when -- prior to Enterprises' purchase of the aircraft, were you involved with assisting Enterprises in its objectives for purchasing the aircraft?

A. Yes, I was. I was involved in not only drafting the lease agreements but also directing the request for the resale account with Texas.

THE COURT: I'm sorry. You were also involved in -- you were involved in drafting the lease agreements but also what?

THE WITNESS: Obtaining the resale account so that the entity could register as a dealer in Texas.

THE COURT: Okay.

Q. (BY MS. GOLDBERG) Were you involved with planning and putting into place the structure of the aircraft?

A. The structure was in a large part in place, but how the aircraft would be used in the structure, I was involved in that part of it and detailing the need for

the lease agreements, the lease agreements being put in place and the resale account being obtained in the state of Texas.

Q. And in that work, did you gain an understanding of Enterprises' purchase -- purpose for purchasing the aircraft?

A. Yes.

MS. SAMS: Objection, hearsay.

THE COURT: I don't know where you're headed, but it sounds like you're going to head to "What did they tell you?" I don't know that you'll be able to do that, and it sounds like that's your sole basis. There may be a time later that you can get it in. I don't know. But I'll let you argue that if and when it comes up. Next question.

MS. GOLDBERG: Okay. I'll move on.

Q. (BY MS. GOLDBERG) Why did Enterprises seek Advocate's assistance with its purchase of the aircraft at issue?

A. One of the --

MS. SAMS: Objection, foundation.

THE COURT: Why did they seek your assistance; I mean, you'd have to establish how she would know why they came to her.

MS. SAMS: And hearsay, Your Honor.

THE COURT: "What did they ask you to do" might be a different -- "When they came to you, what did they ask you to do?" I doubt you'll get an objection to that because it's not offered to prove that anything's true. It's just offered to prove that that's what they asked you to do. I don't know why it helps me, but we'll see. Next question.

Q. (BY MS. GOLDBERG) When clients seek Advocate's assistance with its purchase -- with their purchases of aircraft -- why do clients seek Advocate's assistance with their purchases of aircraft?

MS. SAMS: Objection, foundation, Your Honor.

THE COURT: Why do people generally come to you? I don't -- I think she knows why they -- why do they say they come to you is not offered to prove that what they say is true; it's just offered to prove why they say they come to her. Again, I don't know how that helps me at all to know why they come to you, but I am kind of curious about your business model, so it will satisfy that curiosity even if it doesn't help me in this case.

Why do people generally come to you? Why do they say they come to you? That's your question, right.

MS. GOLDBERG: That is my question.

THE COURT: There you go.

A. Again, Advocate deals with a specialized niche of aviation and tax work. Our clients are primarily using an aircraft in the operation of a business. And in that complexity -- or a complexity arises where you have to deal with FAA regulatory compliance. There's also a major influence of liability protection because of the liability that stems from the operation of an aircraft. And then there's federal and state tax compliance requirements that are often complex. And without having someone that are fully aware of those separate regimes and how they work together is difficult for a lot of clients, including major corporations, to avoid those trap falls that may result.

THE COURT: And by liability, you mean liability for accidents?

THE WITNESS: Yes, sir. Insurance is often obtained, but when you have an accident where it's involving an aircraft, insurance is likely not going to be enough to provide you the liability protection you need.

Q. (BY MS. GOLDBERG) Are Advocate's clients sophisticated in terms of aircraft transactions?

A. Although they're sophisticated in their own

business operations, the operation of a business aircraft, particularly the FAA regulatory regime, they're often not sophisticated in at all.

Q. And do clients involve Advocate for the purpose of avoiding state sales tax?

A. That's not the driving force for clients contacting us. The federal regime is more important for most clients.

Q. Can you tell me a little bit about the services Advocate provided with respect to the aircraft at issue?

A. Yes. The preparation of a lease agreement that was put in place, formation -- I shouldn't say formation, but registration for the resale account with the state of Texas to be able to collect and remit sales tax, analyzing the use of the aircraft to make sure the business use comports with federal requirements as far as recordkeeping and substantiation were primary matters that were done for this aircraft, as well as the Texas property tax rendition, assistance with that.

Q. And can you describe the structure Advocate put in place with respect to the aircraft?

A. Yes. Enterprise owns the aircraft and leases it to Cantu Consulting, LLC. Cantu Consulting, LLC in turn uses that aircraft for its consulting services as well as entering into time-share agreements.

Q. Did Advocate assist with the formation of Consulting?

A. Yes, it did.

Q. And do you mind if I refer to Cantu Consulting as simply Consulting?

A. No, I do not.

Q. Can you explain why the structure you just described was used?

A. Yes. There's an added level of liability protection first starting with segregating the aircraft into its own entity where it's going to be leased to other entities for operation; and then within Consulting, allowing that use pursuant to consulting arrangements and time-share agreements because it provides that added level of liability protection and privacy for the actual users of the aircraft. You will find that a lot of times entities or competitors will track the movement of an aircraft to get a competitive edge; also for liability purposes, again, segregating that asset because insurance is not going to be enough. And on a secondary note, in litigation people will look for high-value assets for deep pockets and to satisfy the judgment, so there's an added level of segregating the asset for that purpose.

Q. And does Consulting own the aircraft at issue?

A.    Consulting does not own the aircraft.

Q.    Was Consulting the operator of the aircraft?

A.    It was the operator of the aircraft pursuant to a dry lease agreement that was put in place.

Q.    Please describe how Enterprises acquired the aircraft at issue.

A.    It acquired the aircraft as part of a 1031 or like-kind exchange, which, although you purchase the aircraft, it allows you to defer any recognition of gain on the purchase under provisions of the Internal Revenue -- I'm sorry, treasury regulations with the Internal Revenue Code.

Q.    Okay.  So I want to direct your attention to --

THE COURT:  Excuse me.  What was the like kind that they did exchange for the purpose of this --

THE WITNESS:  The previous aircraft that they owned was transferred for this new aircraft.

THE COURT:  An equal exchange?

THE WITNESS:  Not an equal exchange in dollar value.  There would be gain on the disposition.  But because of the provisions of the code, the gain is deferred until the second aircraft is sold.

THE COURT:  Thank you.

Q.    (BY MS. GOLDBERG)  I want to direct your attention to the chart that's up on the screen.  This is

for --

MS. SAMS: Objection, Your Honor. This is not in evidence.

THE COURT: Yeah, don't display anything until you've got it admitted. And you may not care. You can use -- both of you can do demonstrative drawings -- you can even draw airplanes if you want, which you're good at it -- and I'm not going to consider it as evidence. Is that okay? Because you may at different times want to, you know, start drawing and have a witness go through your drawings with you. Is that okay? I won't consider it as evidence until it's admitted.

MS. SAMS: Yes, Your Honor.

THE COURT: All right.

MS. GOLDBERG: Yeah, this is simply a demonstrative.

THE COURT: All right. Well, we'll see where you go with it.

Q. (BY MS. GOLDBERG) Does this chart that's up on the screen help you explain what Advocate did in setting up the transaction?

A. Yes.

Q. Can you walk us through the transactions set up by Advocate using the diagram?

A. Yes. The aircraft in this case was purchased by Enterprises. Enterprises purchased the aircraft for leasing. So the lease agreement was put in place between Enterprises and Consulting, and that's the dry lease agreement. Consulting was formed to provide consulting services to various entities within which Mr. Alonzo Cantu has an interest, whether it be a minority or a larger share, but consulting services were provided towards those entities in exchange for compensation, which was generally expenses. In addition, Consulting entered into time-share agreements with parties that would be using the aircraft for issues that were unrelated to any consulting services provided.

Q. Which part of the FAA regulations did Enterprises hold the aircraft for lease under?

A. Enterprises holds the aircraft for lease under FAA Part 91, but the actual operation of the aircraft is done by Consulting, and that's also under Part 91.

Q. Can you explain a little bit about what Part 91 is?

A. Part 91, most people associate it with business aviation because it's used by businesses in the operation of the aircraft for their own business purposes. It's distinguished from Part 135, which is charter operations, and Part 121, which is commercial,

such as Southwest Airlines, where a person is offering the use of an aircraft to a party, pilot and crew services are provided, transportation. Part 91, you can't do any of that. You can't transfer -- transport cargo or persons for compensation.

Q. And what are the FAA penalties if an aircraft is operated outside of Part 91 without proper certification?

A. It's on a sliding scale. It generally ranges from $1,000 to $10,000 per occurrence, which would mean per flight leg. To the extent there's any type of incident in the aircraft, those fines could actually go into the millions.

Q. So were the Texas tax implications a significant reason for the structure that Advocate put in place --

THE REPORTER: Excuse me --

THE COURT: I'm sorry. She didn't follow you either. We need to slow down our pace just a tad.

MS. GOLDBERG: Okay. I apologize.

MR. SIGEL: I would ask you to slow down, too.

Q. (BY MS. GOLDBERG) Were the Texas state tax implications a significant reason for the structure Advocate put in place for the aircraft?

A.    No.  Although tax considerations are going to be considered in any transaction, it's definitely not the driving force behind a particular structure.

Q.    Earlier you used the term time-share.  Can you explain what a time-share is?

A.    Yes.  As I said earlier, Part 91, you're generally prohibited from operating the aircraft by providing transportation services of person or cargo for money, but there is a limited exception within Part 91 that allows you to time-share the aircraft.  And time-share are for large civil aircraft, which essentially means an aircraft that's more than 12,500 pounds.  With a time-share agreement, you're allowed to transfer the person or cargo for compensation, but that compensation is very limited.  It's generally limited to twice the fuel cost and certain incidental fees such as rent fees or airport fees associated with that particular trip.

Q.    Are time-share agreements required to be in writing?

A.    Yes, because it is a large civil aircraft, so an agreement would be required to be in writing.

Q.    And can you just give us a brief example of how a time-share agreement would work under Part 91?

A.    Yes.  With a time-share agreement, using this

particular case as an example, Enterprises would lease the aircraft to Consulting. Although Consulting is operating the aircraft pursuant to that lease, the purpose of its use is actually for the needs of the time-sharee. So the time-sharee may say I want to go from Texas to Tampa. They would document the fuel cost -- or the fuel burned for that particular trip and any fees that they incur, and the time-sharee would pay twice that amount of fuel plus those incidental fees, if any. In addition, the time-sharee, because it is considered transportation, is going to have to remit excise tax on that payment.

Q. And is a time-sharee permitted to use the plane for non-business personal use?

A. Yes, the time-sharee can use the aircraft for any purpose. They're just limited in what type of compensation they can pay to Consulting who is providing the time-share.

Q. Why did Advocate set up the time-share agreements as part of the structure?

A. The time-share agreements would be for use that's not related to the consulting business of Consulting.

Q. And was Consulting set up to generate revenue in a different way other than the time-share agreements?

A. Yes, through the compensation that were received for the consulting with the various entities.

Q. Was the consulting entered into through any kind of arrangement?

A. Say that again. I'm sorry.

Q. Was there a consulting arrangement for the consulting services?

A. There were consulting arrangements with a numerous amount of entities being provided by Consulting.

Q. Can you kind of explain what a consulting arrangement is?

A. Consulting arrangements in this case and in most cases in general, it's a situation where they're going to be providing some type of management or marketing functions, oftentimes long-term strategic management and marketing, in exchange for compensation. That compensation could be a small monthly fee or some type of flat fee in conjunction with reimbursement of expenses or it could just simply be the reimbursement of expenses in conjunction with all those consulting services you may provide.

Q. Are there any FAA limitations on the type of compensation Consulting can receive for these consulting arrangements?

A.   No, the FAA would not govern a consulting arrangement.  And to the extent that there's travel in furtherance of the consulting, that is separate and apart from the area that the FAA would regulate.

Q.   So why would Consulting enter into these consulting arrangements rather than just use time-share agreements?

MS. SAMS:  Objection, Your Honor, foundation.

THE COURT:  I don't know how she would establish why they would do it or -- I'm not even sure how it helps me.

MS. GOLDBERG:  This is, you know -- it goes to --

THE COURT:  What possible reasons would they have for doing it?

MS. GOLDBERG:  Yeah --

THE COURT:  What hypothetically -- you want her to answer what hypothetical possible reasons would they have for doing it?

MS. GOLDBERG:  Yeah, why would a consulting entity enter -- use a consulting arrangement rather than just simply relying on these time-share agreements.  This goes to what she advises her clients to do.

THE COURT: I'm sorry. This goes to what?

MS. GOLDBERG: This is what she advises -- Ms. Bivins advises her clients to do.

THE COURT: I'll allow her to tell me what possible reasons they would have, but I don't know, again, how that's going to help me. I'll let it go to the weight, if any, that I'll give to it.

What possible reasons would they have for doing that?

THE WITNESS: The consulting arrangement would allow them to obtain more compensation. Again, the time-share agreements must be written, it's very rigid, and limits the compensation that could be received, which is going to be a major limitation on revenue that can be generated.

Q. (BY MS. GOLDBERG) So what possible reason would Consulting have for using these time-share agreements?

A. Again, there may be a use for the aircraft that's completely unrelated to the consulting services being provided, and that would allow some revenue to be generated.

Q. Does Advocate provide any services for its clients on an ongoing basis after they set up the structure?

A.   Yes, we continue to provide services regarding federal return preparation.  That includes both income tax and excise tax, any state property tax matters that may be in place and need to put in additional agreements as circumstances change.

THE COURT:  Where's your office?

THE WITNESS:  We have offices in Tampa, Florida and Naples, Florida.

THE COURT:  Where's your office?

THE WITNESS:  My office is in Tampa, Florida.

Q.   (BY MS. GOLDBERG)  Does Advocate provide its clients with any forms to fill out on an ongoing basis?

A.   Yes.  Because there's recordkeeping requirements by the Internal Revenue Service, and in most cases where there's going to be a lease agreement there's going to be a need to maintain the flight log, we provide them a blank flight log that meets those substantiation and documentation requirements of both the service and what would be required under the lease.

And also, if there is any type of excise tax ramifications, which is going to be in place most times when there's a time-share agreement, we provide them with the worksheet to compute that time-share payment that's going to be due as well as the excise tax

liability that will be on the time-share agreement.

Q. I want to go through some of the plaintiff's exhibits with you. I believe they've been pre-admitted.

THE COURT: Nothing has been admitted.

MS. GOLDBERG: Oh.

THE COURT: But if you wish to stand and offer exhibits you may. It's up to you.

MS. GOLDBERG: We would like to offer plaintiff's exhibits, which are Nos. 1 through 21.

THE COURT: No. 1 is a stipulation of facts. That's an interesting exhibit, but that's fine with me if you've all vetted these exhibits and you want to admit them. You're offering 1 through 21, all of them on your list?

MS. GOLDBERG: Yes.

THE COURT: Okay. Any objection to any of plaintiff's exhibits?

MS. SAMS: No. We met before. We have no objections.

THE COURT: Thank you. That's gracious of all of you. Thank you. 1 through 21 are all admitted.

(Plaintiff's Exhibit 1 through 21 admitted)

MS. GOLDBERG: Thank you.

Q. (BY MS. GOLDBERG) Ms. Bivins, will you please

look at Plaintiff's Exhibit 4, which is Tab 4 in the notebook in front of you.

A. Yes, I have it in front of me.

Q. What is this document?

A. This is the dry lease agreement between Enterprises and Consulting for the lease of the airplane.

Q. And did Advocate prepare this lease?

A. Yes.

Q. Who are the parties to the lease?

A. Cantu Enterprises, LLC and Cantu Consulting, LLC as the lessee.

Q. Did Advocate accept the lease rate in this lease?

A. Yes, we did.

THE COURT: When you're referencing Tab 4, I'm assuming, but the record will not assume, that Tab 4 is the same as Plaintiff's Exhibit 4. Is it?

MS. GOLDBERG: Yes, it is Plaintiff's Exhibit 4 when I'm referencing Tab 4, correct.

THE COURT: And I would just for the sake of your record make that clear. Every time you're referencing an exhibit, reference it by exhibit number.

MS. GOLDBERG: Thank you.

Q. (BY MS. GOLDBERG) Please turn to Plaintiff's

Exhibit 21, which is Tab 21.

A.    Yes, I'm there.

Q.    What is this document?

A.    This is the time-share agreement between Consulting and Alonzo Cantu.

Q.    Who is the time-sharor in the agreement?

A.    The time-sharor is Consulting.

Q.    And who is the time-sharee?

A.    Alonzo Cantu.

Q.    Did Advocate prepare this time-share agreement?

A.    Yes.

Q.    Thank you.  Please look at Plaintiff's Exhibit 11, which is Tab 11.

A.    Yes.

Q.    What is this document?

A.    Flight log for the aircraft owned by Enterprises.

Q.    Is the flight log generated by Advocate?

A.    We provide them the format, the blank document -- in this case it was an Excel spreadsheet; now it's an online tool -- but not the actual entry of the flight data.

Q.    Who does Advocate provide the form to?

A.    It's provided to the owner of the aircraft, Enterprises.

Q.    Why does the owner get the form?

A.    The owner wants to maintain a flight log because it's required by Internal Revenue Code provisions.

Q.    And where does the information in the form come from?

A.    It's going to come from the operator of the aircraft, the lessee, Consulting.

Q.    How often does Enterprises submit the flight logs to Advocate?

A.    On an annual basis, to compute the rental amounts and also evaluate the business use of the aircraft.

Q.    On this flight log, who is listed as the aircraft owner?

A.    Enterprises.

Q.    Please look at Plaintiff's Exhibit 12, which is Tab 12 in your notebook.

A.    Yes.

Q.    What is this document?

A.    This is the aircraft invoice detailing the rental charges pursuant to the lease agreement that was put in place between Consulting and Enterprises.  It documents the rental charge for each flight based on the flight hours and then gives the total revenue for the

year -- or rental fees that has to be paid over from Consulting to Enterprises.

Q. Who prepared this document?

A. This document was generated by Advocate based on the information we received in the flight logs.

Q. The flight logs such as the ones we just looked at in Exhibit 11?

A. Yes.

Q. Who is listed as the lessor on the invoice?

A. Enterprises.

Q. And who is listed as the lessee?

A. Consulting.

Q. What is the purpose of this aircraft's renting invoice?

A. It documents the rental payment that's due to Enterprises pursuant to the lease agreement that they have in place.

Q. And if Enterprises and Consulting were not operating under the terms of the lease agreement, would a rental calculation be generated?

A. If they were not following the terms of the lease they wouldn't need it.

Q. Please look at Plaintiff's Exhibit 13, which is Tab 13 in your notebook.

A. Yes.

Q. What is this document?

A. This is the sales tax report which gives the sales tax that's due on the rental payment that's on Exhibit 12.

Q. Did Advocate generate this sales tax report?

A. Yes. The sales tax report is also generated based on the flight log information that's provided.

Q. Can you kind of go through the steps of generating the sales tax report?

A. Yes. The flight information once obtained is processed to determine the total number of hours. And that total number of hours based on the rate in the lease is multiplied to determine the rate. And then sales tax is applied to the total rental payment.

Q. What is the purpose of the sales tax report?

A. The sales tax report details the sales tax that have to be collected from the lessee. Because Enterprises is a registered dealer, it has an obligation to collect the tax and remit it to the comptroller.

Q. Thank you. Please look at Plaintiff's Exhibit 20, which is Tab 20 in your notebook.

A. Yes.

Q. What is this document?

A. This is the confirmation from the sales tax filing for the sales and use tax that was remitted by

Enterprises.

Q. Who prepared the sales tax filing?

A. Advocate did.

Q. And who is the taxpayer on this sales tax return?

A. The taxpayer is Enterprises. Again, they're the registered dealer with the State of Texas, so they have a duty to collect and then remit over to the State the tax collected.

Q. So one of the things mentioned in the opening statement, which you were not here for, was that there were no paper checks from Consulting to Enterprises. Does that mean that no rent was paid on the rental payments?

MS. SAMS: Objection, foundation.

THE COURT: Let's not make any statements, especially about what lawyers are saying in opening statement. Let's just ask the witnesses questions about what they know. New question.

Q. (BY MS. GOLDBERG) Are paper checks required to show that rent was paid from the lessee to the lessor?

A. No. The paper checks themselves is not a reflection of the lease transaction. That's documented by the written lease agreement itself. And then further evidence of that is the flight log being maintained by

the lessee in accordance with the terms of a rental agreement. Then rent being computed on an annual basis in accordance with the terms of the rental agreement, invoicing being provided, sales tax being computed and provided to the lessee as well, those are documents that evidence a lease transaction. Absence of a check itself does not negate the lease transaction.

Q. Is it unusual for related entities to not write checks for such lease payments?

MS. SAMS: Objection, Your Honor. Calls for an opinion. This is really getting into the area of expert testimony. She's not being offered as an expert.

THE COURT: I think it's really just facts, in her observations is it unusual for them to do it this way. I'll let you cross-examine about this. And again, I don't know how much it's going to help me, but we'll just see.

Do you remember the question?

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

THE WITNESS: It is not unusual when it's closely held or related entities.

THE REPORTER: Related entities?

THE COURT: I'm sorry. I don't think she got your answer. "It is not unusual when it's

closely" ...

THE WITNESS: When it's closely held or related entities, it's not unusual for it to be -- or an absence of a physical check transferring payment.

Q. (BY MS. GOLDBERG) When Advocate set up the structure related to the aircraft, did Advocate instruct Enterprises on how to do its accounting?

A. No, we did not provide instructions on how to do the accounting.

Q. And based on the structure that Advocate set up, how would the federal income tax reporting be handled?

A. Consulting is a single member limited liability company. That being the case, for federal income tax purposes it does not file its own return unless it makes a special election to be treated as a corporation. That was not done in this case. So all items of income and expense of both Consulting and Enterprises would be reported on a single return of Enterprises.

Q. Is Consulting a disregarded entity for federal income tax purposes?

A. Yes, it is a disregarded entity for federal tax purposes.

Q. Did Advocate recommend to Enterprises how the tax returns should be prepared?

A. They were advised on how their tax returns should be prepared. There's really no recommendation absent that election. Their required to file one consolidated return. It does not have the ability to file a separate return.

Q. Have you become aware of how the accounting was handled?

A. Yes, I have.

Q. How was it handled?

A. On a consolidated basis in line with the federal income tax reporting.

Q. In your experience, do closely-related companies keep separate books?

A. When you say separate books, that's kind of a, I guess, misnomer. Do they document their transactions? Yes. They may be in one program where they have separate files for each entity, or it could just be one program and they generate the reports as needed to look at activity of a particular entity.

Q. So if closely-related companies keep their books in a single file such as in Quick Books, are they still able to generate the reports they need?

MS. SAMS: Objection, leading. I'm going to object to the leading.

THE COURT: You don't get to lead the

witness, as you know.  Don't say anything to suggest the answer.  Why don't you try a new question.

Q.   (BY MS. GOLDBERG)  Do closely-related companies sometimes keep their books in a single Quick Books file?

MS. SAMS:  Objection, leading.

THE COURT:  I think you are suggesting the answer.  The open-ended question is "How do they keep their books?"  So don't suggest the answer and we won't have a leading problem.  Next question.

Q.   (BY MS. GOLDBERG)  Is there anything inherently wrong with keeping a consolidated set of books?

A.   There is no violation of any federal income tax requirements or even accounting principles.  Especially with the electronic or automated accounting functions, Quick Books being one of them, it's easy to generate the reports needed to isolate a single activity, so there is nothing prohibiting consolidated books.

Q.   Did Advocate have an expectation regarding how revenue would be transferred between the two entities?

THE COURT:  I'm sorry.  Did Advocate have what?

MS. GOLDBERG:  An expectation regarding how revenue would be transferred between the two entities.

MS. SAMS:  Objection, leading.

THE COURT: I'm not sure I understand why it would matter what Advocate's expectation was. The question is -- I'm having trouble making sense of it. Do you want to try a different approach?

MS. GOLDBERG: Sure. Advocate set up the structure that should be followed, and the defendants are claiming that the structure -- there is something inherently wrong with how the parties operated under that structure.

THE COURT: Well, you're just going to need to ask a question that I understand. I don't really understand the question, so try it again.

MS. GOLDBERG: Okay.

Q. (BY MS. GOLDBERG) Based on your knowledge of the bookkeeping, do you believe that the structure Advocate set up was followed?

A. Yes, I do believe that the structure was followed. Again, this was a disregarded entity for federal income tax purposes. They would be filing a consolidated return based on the books that we received on preparation of those returns. The consolidated federal income tax reporting was reflected in their consolidated accounting books.

Q. Please look at Plaintiff's Exhibit 5, which is Tab 5 in your notebook.

A. And I apologize. I am freezing. Is it okay if I get my jacket?

THE COURT: It's certainly okay.

MR. SIGEL: Or I'll --

THE COURT: Counsel may approach the witness in order to provide her jacket.

MR. SIGEL: I'll get it.

THE WITNESS: I apologize.

MR. SIGEL: I'll approach with the jacket with the Court's permission.

A. And was that Exhibit 5? I'm sorry.

Q. (BY MS. GOLDBERG) Yes, Tab 5.

A. I'm there.

Q. What is this document?

A. This is one of the accounting records from the consolidated books. It's the sales detail.

Q. Can you tell whether the sales were made by Consulting or Enterprises?

A. Based on the memo and knowing that Consulting is a disregarded entity of Enterprises, I can tell that this is the record of transactions of Consulting.

Q. What about the memo tells you that?

A. It denotes that it's consultation service -- well, consultation, which is in line with their consulting services.

Q. Is Consulting required to remit federal excise tax?

A. Consulting is required to remit federal excise tax on the revenue that's collected from the time-share agreements.

Q. Why is it required to remit federal excise tax on the revenue collected from the time-share agreements?

A. Because the time-share agreements are considered a transportation service. So although Consulting is leasing the aircraft and a dry lease is not subject to excise tax, it's then in turn using the aircraft to provide transportation services.

THE REPORTER: I'm sorry. I want to make sure I got that. Although Consulting is leasing the aircraft ...

THE WITNESS: Although Consulting is leasing the aircraft from Enterprises, that dry lease is not subject to excise tax, but because Consulting is then using the aircraft to provide a transportation service, that is subject to excise tax, the tax on air transportation.

Q. (BY MS. GOLDBERG) Does Advocate file the excise tax returns for Consulting?

A. Yes.

Q. Who is the taxpayer on those tax returns?

A.   On those returns -- again, the disregarded entity is a disregarded entity for most federal tax purposes.  That's going to include the filing of the excise tax return.  So the taxpayer that's listed is Enterprises although the excise tax and the transaction giving rise to the excise tax is the transaction of Consulting.

Q.   And what was Advocate's expectation regarding how Consulting and Enterprises would report for federal income tax purposes?

MS. SAMS:  Objection, relevance.

THE COURT:  How on earth would this help me what Advocate's expectation was regarding Consulting and Enterprises, how they're going to report for federal income tax purposes?  Why do I care what Advocate was expecting to happen?  Do you see my --

MS. GOLDBERG:  Yes.

THE COURT:  I don't know how that -- how that possibly pertains to the tax issue -- the state tax issue in this case.

MS. GOLDBERG:  Advocate set up the structure, and we want to establish that the structure was followed and that it was proper for Consulting under that structure not to file its own federal income tax returns.  We think the defendants are going to argue

that the lack of federal income tax returns filed by Consulting is somehow indicative of a collapsed structure between Enterprises and Consulting.

THE COURT: Okay. Well, I think I can just hear it and decide whether to give it any weight at all. Your argument at the end of the case is going to be give that zero weight, right, that it doesn't matter, not that you don't believe what she's saying, but it doesn't matter?

MS. SAMS: Yes, Your Honor.

THE COURT: All right. Go ahead.

Q. (BY MS. GOLDBERG) So based on the structure Advocate set up, what was the expectation regarding how Consulting and Enterprises would report for federal income tax purposes?

A. Although Consulting is a disregarded entity for tax purposes, otherwise a respected entity for state law purposes, we understood that they would be filing a single return where all items of income and expense for both entities would be on one single return and that would be the return of Enterprises.

Q. Please look at Plaintiff's Exhibit 6, Tab 6.

A. Yes.

Q. What is this document?

A. This is the consolidated profit-and-loss

statement of Enterprises and Consulting.

Q. Is there any reason for Consulting to generate its own profit-and-loss statement?

A. Absent a need to file a federal income tax return, which it wouldn't do because it's a disregarded entity, there is no need for it to generate a separate profit-and-loss statement.

Q. Is there a depreciation deduction listed on the profit-and-loss statement? It might be called depreciation expense.

A. Okay. Just a second. Yes, it is. There is a depreciation expense for $1,076,761.

Q. Who would take that depreciation deduction?

A. Depreciation expense is an expense of Enterprises. And although it's listed as an expense, it's really a deduction that's allowed under the Tax Code. It's not a physical or economic outlay of cash. It's a deduction that's done under a five-year depreciation schedule, which in turn adjusts the basis of the aircraft.

Q. And which taxpayer on the tax return would get that depreciation deduction?

A. Enterprises.

Q. Would the depreciation deduction flow through to anyone else?

A.    It would flow through to the members of Enterprises.

Q.    Who are the members of Enterprises?

A.    Alonzo and Yolanda Cantu.

Q.    And is the depreciation deduction a permanent benefit to Alonzo and Yolanda Cantu?

A.    No.  Upon the sale of the aircraft, that gain is subject to ordinary income tax.

Q.    Earlier you mentioned that Advocate assisted Enterprises with its property tax rendition.  Were you involved with any valuation of the aircraft?

A.    Yes.  Part of the property tax rendition, you not only provide the value of the aircraft, which is what you're reporting to the State, but you're also providing the amount of Texas use.

THE COURT:  We're going to take a break pretty soon.  The court reporter's been going an hour and 45 minutes, we all have, just on this case.

MS. GOLDBERG:  I have two more questions.

THE COURT:  All right.  Good.

Q.    (BY MS. GOLDBERG)  As part of the analysis for property tax purposes, would you expect there to be a positive cash flow in the first few years of aircraft ownership?

A.    Definitely not within the first several years

of ownership.

Q.   Would there eventually be a positive cash flow?

A.   Due to the long useful life of aircraft, generally anywhere from 40 to 50 years, you would eventually expect a positive cash flow.

MS. GOLDBERG:  That's all I have for now. Thank you.

THE COURT:  You pass the witness?

MS. GOLDBERG:  I pass the witness.

THE COURT:  All right.  We'll go ahead and do cross-examination after the lunch break.  I'm going to resume with you at -- I've got to take care of some other matters.  It's 12 till 2:00 now.  I'll resume with you at 12 till 2:00, exactly two hours from now.  I'll see you then.

And you may step down if you wish.

MR. SIGEL:  May I make a quick inquiry to the Court?

THE COURT:  What is your inquiry?

MR. SIGEL:  Well, I'm just wondering, do you envision that this trial will go into Thursday just given our scheduling?

THE COURT:  Well, I've already explained to you I'm not available tomorrow morning at all because of a medical appointment.  And tomorrow afternoon I can

this time-share agreement, if Alonzo Cantu used the plane, he was only supposed to pay the cost that is reflected under No. 2, correct?

A. Correct.

Q. And that -- would it be a fair characterization that those are the operating expenses of the aircraft?

A. Essentially the operating expenses, yes.

Q. So this is a time-share agreement between Alonzo Cantu and Cantu Consulting, right?

A. Yes, it is.

Q. And Cantu Consulting agrees to operate the plane for Alonzo Cantu, correct?

A. Essentially that's what it boils down to, correct.

Q. And in return, Alonzo Cantu agrees to pay Cantu Consulting the expenses of operating the plane?

A. Correct.

Q. And there is no rental or lease rate above those operating expenses?

A. It's not permitted to be. This tracks the language of the FAA part that limits the consideration that can be received on a time-share agreement.

Q. So the answer is that there's no lease or rental rate contained in this time-share agreement?

A. Between Mr. Cantu and Consulting, no, there

Cantu had zero interest?

A.   That I would not know.

Q.   The lease agreement required Cantu Consulting to pay for all of the expenses, correct?

A.   Correct.

Q.   And the lease agreement also required Cantu Consulting to pay a 600-dollar-per-hour flight hour rate on top of that, correct?

A.   Correct.

Q.   And you previously testified that if a lessee were only paying $600 per flight hour, that would be below fair market value, correct?

A.   I previously testified to that here?

Q.   During your deposition.

A.   Okay.  What did I testify to?

Q.   That if a lessee were not paying operational expenses and were only paying $600 per flight hour, that that would be below fair market value for this plane?

A.   Yes, I did testify that it wouldn't comport with fair market value rates if they paid that decreased rate without taking on the expenses.

Q.   And when you communicated with Cantu Enterprises, you generally dealt with Rene Borrego, correct?

A.   Yes.

THE COURT: No, he didn't ask you what the purpose is. He just said do you know it. Do you know it or -- I guess you do because now you're telling us what it is. But do just listen to his question and only answer that question.

Q. (BY MR. SIGEL) Let me just rephrase it. Are you aware of the purpose of Enterprises in buying the plane at issue?

A. Yes.

Q. And how are you aware of that purpose?

A. It was a business decision to get into the leasing business.

Q. Okay. Could you explain the purpose of Enterprises in buying the plane at issue?

A. The purpose for me was to make money and have an entity that would pay itself over time and have a paid asset over time, which would be the plane.

Q. Okay. Could you sort of explain the business plan that --

A. Well -- I'm sorry. Go ahead.

Q. No, go ahead.

A. It's very simple for me. I was able to borrow money at a very low rate, low down payment. I would lease the plane to different entities and get cash flow, pay off the plane and eventually wind up with

basically --

THE REPORTER: I'm sorry. I need you to slow down.

THE WITNESS: I'm sorry.

THE REPORTER: Wind up with ...

THE WITNESS: What I wanted to do is lease the plane to different entities that I -- and with the cash flow that I got, pay off the plane, the note, and then have an entity with an asset that was paid for.

Q. (BY MR. SIGEL) Was this a recourse loan or a non-recourse loan?

A. Non-recourse loan for a low interest rate and low down payment.

Q. What was the significance of it being a non-recourse loan?

A. I'm not responsible for the liability of the --

THE REPORTER: Not responsible for ...

THE WITNESS: For the loan on a personal level, like personal guaranty.

Q. (BY MR. SIGEL) Were you expecting to make a short-term profit in this business?

A. No. My expectation would have been to have an asset that was free and clear --

THE REPORTER: Excuse me. I think I need to adjust this.

*(The Court gave instructions on the use of microphone)*

THE COURT: Let's go back to a question.

THE REPORTER: I'll repeat the question. "Were you expecting to make a short-term profit in this business?"

THE WITNESS: No, it wasn't a short-term profit. It was a long-term profit, long-term being, you know, five to eight years.

Q. (BY MR. SIGEL) And are you talking about from the perspective of the actual entity Cantu Enterprises, LLC?

A. Yes.

Q. Did Enterprises have any other purposes in buying the plane besides those you've just identified?

A. No.

Q. Did Enterprises want to use the plane?

A. No.

Q. Now, were you anticipating that you would be a passenger in this plane once it was purchased?

A. Not -- every now and then. You know, I didn't buy it for me.

Q. Is there a distinction between you riding as passenger in the plane and the objective of -- objectives of the entity in Cantu Enterprises, LLC?

A. Well, the objective, like I said, is to lease it and make money, not necessarily to be on the plane. I fly on the plane probably 25, 30 percent of the time. And when I'm flying, I'm flying with one of the entities that leases it, so I get paid. On a personal level, I fly very little.

Q. When you mention that you fly on the plane personally, how many times a year do you fly on the plane personally pursuant to the time-share agreement?

A. I would say probably ten times a year.

Q. Now, if Enterprises had never bought the plane in question, would you still be able to enjoy the personal benefit of being a passenger on a business aviation jet that you currently enjoy?

MR. BOLSON: Objection, leading.

THE COURT: Well, I'm not really sure it suggested the answer. It may have, but I'm not really sure that it's that controverted, this particular question. In any event, try not -- from this point forward, don't ask any questions that suggest the answer. Just ask open-ended questions and see where they go.

MR. SIGEL: Okay. So are you allowing him to answer this?

THE COURT: You may not lead. I'll allow

correctly?

A. Correct, but you didn't -- you didn't follow up. The entities don't use the plane for free. They pay a lease. They pay a lease payment depending on the hours, so it's all cash flow. And so I get cash flow, which is the lease, and I have learned a lot from the plane, and I do have a ranch that I opened. And we talked about earlier -- you asked me about equipment leasing, and I haven't started that yet. And it's all about cash flow.

Q. Okay. Would you characterize the most important objective for your purchase of this aircraft to be for your business and basically for the convenience for your business?

A. I think the number one is priority is to make money. The way we're going to make money is to lease it. Nobody flies the plane for free.

Q. I'm going to have you turn to Page 26. But before I do that, I'm sorry, if you could just turn to 25, Line 23. Are you there?

A. Yes.

Q. Question: "You identified a few objectives in your purchase of the subject aircraft, one of which was convenience. Can you --"

And then it comes up and said, "The first

Q.   Okay.  So let me read this to you and you tell me why you think that's consistent with your testimony on direct.  I'm going to read from Lines 5 through 11.

"Okay.  Now, Mr. Bolson asked you some questions about your personal objectives with respect to this aircraft, and you talked about convenience and wanting to have a plane available.  I guess as a follow-up, what was the objective of Cantu Enterprises, LLC in buying the aircraft?"

Answer:  "Strictly business leasing."

Now, is that consistent or inconsistent with your testimony on direct?

A.   It's consistent, and I've said that before.

Q.   Okay.  Well, I think that on cross-examination Mr. Bolson questioned you about the convenience and flexibility --

THE COURT:  Let's go straight to questions because you're speaking an awful lot.  Let's go to a question.  Go ahead.  Since this is your witness.

Q.   (BY MR. SIGEL)  Well, you heard -- you heard Mr. Bolson ask you about the convenience and flexibility of having a plane available, right?

A.   Right.

Q.   Do you recall that testimony?

A.   Yes, sir.

Q. Is the convenience and flexibility of having a plane available the reason why the entity Cantu Enterprises, LLC purchased the plane at issue?

A. No. I mean, I can tell you it's just about cash flow, leasing, like my real estate investments. It's the same thing. That's why I'm looking at equipment leasing now. I think it's an entity that generates cash flow. If you have debt, it'll service the debt. Sometimes it's negative. But as long as you have a good hard asset, like I mentioned my house in the Valley a few times, I can rent it, but I don't rent it to just anybody. When I pay off the mortgage, it's an entity that's -- it's an asset I can sell or continue leasing for cash flow.

Q. Well, do you disagree with the suggestion that's been made that this plane was purchased for your personal use and that your personal convenience and flexibility justify the purchase of this plane?

MR. BOLSON: Objection, leading.

THE COURT: I do think you're suggesting the answer, "Don't you disagree with that?" You're really just speaking and getting him to say yes, I disagree with that. So I do think that suggests the answer. Let's ask more open-ended questions since you cannot lead this witness.

MR. SIGEL: Well, let me reask it.

Q. (BY MR. SIGEL) Have you heard Mr. Bolson's suggestion that this plane was purchased for your personal convenience and flexibility?

A. I heard him say that. That is not the fact because I don't fly enough. I don't have time to fly. I'm busy all the time. To me it's a business enterprise that generates cash. And hopefully, if it flies enough, we'll have enough cash flow to service the debt.

Q. Well, if you hadn't bought the plane, would you have the same convenience and flexibility without having this plane that this entity owns available to you?

MR. BOLSON: Objection, leading.

THE COURT: I'm not sure that does suggest the answer, at least not in a way that's obvious to me. Go ahead.

A. Initially when we bought the plane, we were looking at cash flow and looking at the pros and cons and thought we might have a negative cash flow. And for convenience I could have bought time-share hours; or I don't know what they call it when you fly with someone else. But we decided I think we can generate enough cash flow from the leasing to pay off the debt. And yes, like I told you earlier, I mentioned last week I had to lease a plane to go to Houston. And a few months

back I had one for Dallas.

THE COURT: A different plane?

THE WITNESS: A different plane.

Q. (BY MR. SIGEL) Well, is it true that as this plane has been made available to you after it was purchased you've seen convenience and flexibility just as a passenger in it?

A. Yes.

Q. Was that the reason why the plane was purchased by the entity Cantu Enterprises, LLC or not?

A. Yes.

Q. Well, you're saying convenience and flexibility was the reason?

A. No, no, no. The number one priority was cash flow leasing. I think we're getting confused here. I'm all about cash flow and how are you going to get cash flow for leasing. Now, is it convenient for me to have a house at the island? Well, when I go if it's available I'm going to go because it's a nice place, just like the plane. But I'm not going to go buy something for several million dollars to go use it just every now and then because I want it on demand.

THE COURT: Why did you have to lease another plane? You've got me curious now. Was this plane not available?

# Reporter's Record Volume 3 Reply Reference

3 RR 7–9

3 RR 8

3 RR 12

3 RR 14

3 RR 18–19

3 RR 22

3 RR 27

3 RR 32–33

3 RR 37

A.    Contrast my roles?  Well, they're very similar. Mr. Cantu trusts me.  I've worked for him for a long time.  I have a really good knowledge of the way he does business.  And I take care of his -- I take care of his -- I take care of his wealth to make sure that we protect his assets and to make sure that we provide him as much liability protection as we can.  That's the primary role.

Q.    Do you work with him on business plans?

A.    Yes.

Q.    What is your role with Consulting?  And I mean the entity called Consulting.

A.    With Cantu Consulting, when we -- when we bought the plane, I'm the one who negotiated the loan. I met with several banks and negotiated a non-recourse loan, which means that Alonzo didn't have any -- he wasn't at risk personally if the loan went bad or anything like that.  I consulted with the insurance brokers.  I consulted with Advocate with the structure. I looked at the planes, the type of planes, that type of stuff.

Q.    What was your role in the decision to purchase the plane by Enterprises?

A.    I guess I'm probably the one who spearheaded that, having talked to some brokers that approached us

about buying and selling planes to us. We looked at things like range of fuel efficiency, cabin size, going to dual pilots instead of single pilot. The first plane was single pilot. The second plane was dual pilot. I looked at all of those things. But I also looked at the fact that business-wise we could -- we could -- it would cash flow in such a way that Alonzo would have an asset that had value for 30 or 40 years once we finished paying the debt. To me it made sense.

Q. Now, did you make a distinction -- excuse me. Did you make a distinction between Enterprises as an LLC and Mr. Cantu as an individual?

A. Yes. Alonzo's a very complicated individual. He's a sophisticated investor. And every asset that he has we structure in such a way that they're separate entities. For example, his tax return this year, we'll have 90 K-1s that feed into his return this year. So every asset, we meet with estate planners. We meet with attorneys. We meet with our insurance brokers. We do everything we can so that we're structured in such a way to protect his wealth and reduce his liability, his exposure.

Q. We've heard some testimony from Ms. Bivins, and I know you were here for that testimony, but I'd like your factual testimony regarding the role of Advocate

Consulting.

A. You know, we rely heavily on Advocate when it comes to the plane. When we bought the plane -- or when we decided to go into the plane business, the leasing planes, we had no idea how complex it is to own a plane. I thought you could just -- like buying a car, you go on and you go wherever you want. That's not the way it works. The FAA heavily regulates the industry for security reasons and for other reasons. It's very, very complicated and the forms that are used. There's no way that I was ever going to be an expert. There's no way I would want to be an expert. I'm just way too busy to get into that. So I'm very dependent and very reliant on Advocate to consult with us, to make sure that we're in compliance on the tax side, on the legal side with the FAA. You know, they're my go-to people. We wouldn't -- we couldn't operate without them.

Q. Who was doing the bookkeeping for Enterprises?

A. We outsourced that to the Cantu Construction staff.

Q. And who was doing the bookkeeping for Consulting?

A. The same staff.

Q. Can you give an approximation of how many entities that staff does bookkeeping for?

return.  I don't know if I answered the question.

Q.  Well, was there any other reason why there wasn't a separate bank account set up for Consulting, or have you stated all the reasons?

A.  No.  Well, we talked to our tax accountants, and when they set up Cantu Consulting, it was a single member LLC.  And single member LLCs can't file tax returns.  They have to file consolidated returns.  And we've had some experience in the past.  We had a company called Cantu Management, LLC that was also a single member LLC.  And we got a letter from the IRS telling us that we couldn't file single member LLC; we had to file a consolidated return.  So we do have some experience with single member LLCs.  And knowing that we were going to have to do a consolidated return and for the ease of the bookkeeping process, we -- our books were left in a consolidated form to match what we were going to do for the tax return.

Q.  Now, on a monthly basis, did Enterprises have access to funds, the payment of the various expenses?

A.  Enterprises really didn't have a way of generating money.  They didn't have any -- other than the leasing payments they got from Cantu Consulting, they had no source of revenues.  Cantu Consulting was actually the one who generated the revenue.  So that

A.    We created wealth.

Q.    Okay.  So you mentioned several times business plans.  Were there any business plans done in connection with the decision to purchase the second plane?

A.    Definitely.  I mean, we looked at it.  We thought that it would cash flow.  We thought that it was a good investment.  As a matter of fact, our situation right now is the plane is worth somewhere north of $5 million.  Our debt is probably close to a million dollars or less.  So we've created like $4 million in equity since we've had this plane.

Q.    Well, I think you're kind of jumping ahead with me, you know, which is okay, but I want to focus first on the planning that went into this --

A.    Sure.

Q.    -- as opposed to the results that you've achieved.  Focusing on the planning that went into this, kind of walk us through what analysis was done before the decision was made to buy the second plane to the extent you haven't already done it.

MR. BOLSON:  I'm going to object because it calls for a narrative, and it's asked and answered.

THE COURT:  Do you want to take another stab at it or do you want to have an argument about this?

It's not easy to buy a plane. I'm not an expert on planes or aviation. I'm not an expert on the aviation industry. So I relied heavily on experts to give me guidance as to what type of plane to buy and what kind of structure to create, whether or not the cash flow will be good, range and things like that. It wasn't a decision we took lightly or I took lightly. It was a decision that we worked at, and it was -- it was a business decision. It was not -- it was something that we put some effort into.

Q. (BY MR. SIGEL) Well, I want to phrase this question carefully. I don't want you to tell me what Mr. Cantu told you about the decision. I do want you to tell me what you told Mr. Cantu about the decision to buy the plane.

A. I told him I thought it would work out fine. There's always risk in every business. And like any other business, there were some risks in this. But I thought that we could reach our objectives in a safe manner. The plane was going to maintain its value. My recommendation to him was that it was a good investment. In fact, we even -- to this day we're looking at maybe buying other planes. We try real hard to diversify ourselves. We're very heavily in real estate. He has a lot of his wealth in the hospital units. He has a lot

of wealth in the bank stock. And down in the Valley we don't have a lot of big corporations, so you really have to work hard in creating wealth down there. And so we're trying to diversify a little bit, and this was just one effort. The restaurant was a little bit of diversification. The title company was some diversification. We don't have a huge amount of assets invested there, but it is diversification nonetheless.

Q. Did Mr. Cantu to your observation take a role in actually looking at the particular plane before it was purchased?

A. I don't think he even saw it until we brought it in the market -- until we bought it.

Q. Why do you say that?

A. I don't remember him looking at it. I don't remember him going to go visit it. I don't remember -- I don't think -- I don't recall that.

Q. Let me ask about the pilot arrangements. Could you kind of explain how that worked for both of these planes?

A. We had a contract with a company called Garza Flight Services. And Garza Flight Services, they're responsible for hiring pilots, for training pilots, for finding pilots and then providing us pilots when we need them.

Q. So how did the parties operate before the agreement was physically executed by Mr. Cantu?

A. Well, the agreements were already -- they were already agreed upon. We already had the -- I guess you would call them oral agreements in place. We already had stipulations of what was going to happen. We already had the structure in place. Nothing was going to change. No one was going to object to the structure. We were all in agreement with the structure. So it was already in place. I don't know, I guess -- I don't really know -- I'm not a lawyer, so I don't know how you describe it, but I guess it would be oral agreements, I guess. I don't know.

Q. Well, who was operating the plane before the lease agreement was executed? Cantu Enterprises or Cantu Consulting?

A. Cantu Consulting. Cantu Enterprises wasn't operating it.

Q. Was the plane delivered to Cantu Consulting in the same form or condition that it was purchased by Cantu Enterprises?

A. That's correct. No modifications were made to the plane.

MR. BOLSON: I'm going to object. Sorry for being a little late on that, but I'm going to object

very easy.

Q. Has anyone except the comptroller's office objected to the way the bookkeeping was done?

A. Not that I'm aware of.

Q. Has the IRS objected?

A. Not at all.

Q. There's been some testimony that you've heard about whether the lease was followed. Have you heard that testimony?

A. Yes.

Q. And do you understand that one of the questions that's been raised is whether the operating expenses were ultimately charged to Consulting, correct?

A. That's correct.

Q. And based on your factual knowledge, was the lease followed or not with respect to the operating expenses?

A. In practicality, the money used to pay for the expenses was Cantu Consulting's money. Cantu Enterprises had very limited way to generate income. Cantu Consulting through their consulting business is the one who generated all the revenue. They're the ones who had the clients. So their money was deposited in the account and their money was used to pay the bills. It wasn't Cantu Enterprises' money.

A.   I would -- I would probably want to look at multiple years to tell you specifically.

Q.   Well, you've got 2010, 2011, 2012.  Is that enough for you to give us an assessment at least based on those three years?

A.   Give me just a moment to look at them. Basically, if you -- it's showing some losses, but a lot of that loss is what they call a paper loss.  If you add back the depreciation, cash flow-wise they're probably losing somewhere between -- it was I guess about 3 or 400,000 the first few years, and I think it's gotten down to -- if I did the math correctly, down to about 250 or 300,000 in the more recent statements.

Q.   Well, I think that there's been a lot of suggestion that these losses somehow are a negative factor.  Do you agree that this is a negative situation or not?

MR. BOLSON:  Objection, leading.

THE COURT:  I'll allow this.

A.   In the big picture, I think that we've accomplished what we wanted to accomplish in this particular business.  We have an asset that has a value north of $5 million.  Our debt is almost gone.  Probably within the next couple years the debt will be gone.  The asset will have a useful life of 30 to 40 years.  In

comparison to the way we handle other rental properties, it's a very similar type transaction. It worked out the way we wanted it to.

Q. So do you label this as a success or a failure?

A. I think it's a success.

Q. You mentioned that there was some planning to actually buy a third plane.

A. I'm sorry. I didn't hear you.

Q. You mentioned earlier -- I believe I heard you say there was some planning to purchase a third plane. What were you referring to there?

A. We have been talking with a broker in the last few months about buying another aircraft, increasing the fleet size. In the Valley there's not that many charter -- or aren't that many planes in the Valley. I think that we would have -- with the continuing growth of the companies that we do consult with, with the hospital and the bank, I think that we would have been able to justify -- we would be able to justify buying another plane and increasing our services.

Q. Now, if you could look at Plaintiff's Exhibit 12, please. Can you tell us what this document shows?

MR. BOLSON: Your Honor, I'm going to object on grounds of lack of foundation. I believe

Enterprises from the point at which the plane at issue was purchased?

A. Yes.

Q. And why do you say yes?

A. Well, Cantu Consulting, they're the only ones that had a mechanism for generating revenue. Cantu Enterprises had no mechanism for generating revenue other than the lease payments that it got from Cantu Consulting. Cantu Consulting, because of the work they did, because of the consultations they did, they generated revenue that created the funds to make it possible to pay the bills and continue to operate the aircraft.

Q. From a liability standpoint, were they run separately or the same -- as the same entity?

A. They are separate. Like I mentioned to you earlier, we have dozens of lawyers and estate planning attorneys and accountants that consult with us on a regular basis for making sure that our entities are set up in such a way that they shelter other assets from liability.

Q. From a recordkeeping standpoint, were these run as separate entities?

A. From a recordkeeping I would say no. We had a consolidated set of books.

# Reporter's Record Volume 4 Reply Reference

4 RR 52

4 RR 81–85

Q. I'll refer your attention to Line 10. My question at that time was, "Would it be fair to say that the entities that rented the aircraft were either Mr. Cantu or Mr. Cantu's business entities?"

And your answer on that date was, "For the most part, yes."

A. That's what it says here.

Q. And so your answer today is inconsistent with the answer you provided back then. Would you agree?

A. Yes.

Q. I believe you indicated that Cantu Construction paid for -- or at least operated this aircraft from time to time; is that right?

A. It would probably be less than ten flights.

Q. And would Mr. Cantu ever personally pay for those flights?

A. I don't know.

Q. Do you know if Mr. Cantu ever paid for any of the flights on behalf of the entities that you were billing for those flights?

A. I don't believe he -- as a matter of practice, I don't think he does that, no.

Q. Could I have you turn to Defendant's Exhibit 14, please.

A. Okay.

It's not offered to prove that what the bank said is true but that they made these interrogations. Let's limit it to that and keep doing.

Q. (BY MR. SIGEL) Would you please continue your answer?

A. I also got the loan officer in contact with Advocate Consulting, and I believe he also talked to our CPAs. But he did a very -- he did a lot -- he asked a lot of documents from me. I had a lot of conversation with him. He ran spreadsheets for me on the mileage of the plane, the efficiency. He also helped us do some research on the acquisition of the plane as well.

Q. You mentioned that the bank evaluated the business plan. What was -- what did you communicate to the bank about the business plan?

A. Exactly what our intent was on the use of the bank and what services we planned on providing.

Q. Did you express to the bank why Enterprises was buying the plane?

A. Yes.

Q. And what did you tell the bank officer?

A. When we met with -- when I met with the bank officer I expressed to him that we felt like the aircraft would help facilitate our consulting business and that it would help grow our clients' businesses with

Alonzo being able to attend meetings with them and particularly political meetings in Austin and Washington.

Q.   Was there a discussion of the leasing structure?

A.   Yes, there was.

Q.   And did you explain the role, if any, of the lease in the transaction?

A.   I did to the best of my ability.  But like I mentioned earlier, I'm really not an expert on the exact intricacies of each document and what they do and that type of stuff.  So a lot of that information they would have had to have gone to Ms. Blevins [sic] to get.

Q.   Are you talking about Ms. Bivins with Advocate Consulting?

A.   Ms. Bivins.  I'm sorry.  Ms. Bivins, yes.

Q.   So did you put the bank in touch with Ms. Bivins to discuss the details of the transactions that she testified about earlier?

A.   Yes.

Q.   And was there a discussion about the business model being a lease structure with the plane being leased by Enterprises to Consulting?

A.   Yes, there was.

                MR. BOLSON:  Objection, leading.

THE COURT:  Excuse me.  Once a lawyer stands you have to stop.

MR. BOLSON:  My objection is leading.

THE COURT:  It was leading.  Different question.

Q.  (BY MR. SIGEL)  Did you have any discussion with the bank officer with Wells Fargo about the structure that was going to be used?

A.  I did.

Q.  And could you describe what that discussion was?

A.  I spoke to him about the leasing -- or the consultation services that Cantu Consulting would be providing.

Q.  And was there a discussion about the lease structure where you discussed that with him or not?

A.  I myself did not get into that specific part of it.  I'm sure that he would have had that conversation, though, with Advocate, not with myself.

Q.  Well, just to clarify, did you provide the lease agreements to Wells Fargo?

A.  Yes, I did.

Q.  Okay.  So was that you who provided it or was it Advocate who provided the lease agreements?

A.  Advocate provided me with all of the

rough drafts and all the -- I'm sorry, with the documents, and I turned around and forwarded them to them -- I'm sorry, turned around and forwarded them to the bank.

Q. Well, just to clarify, are you referring to rough drafts or are you referring to the final documents?

A. To the final documents.

Q. Okay. So you didn't portray those lease agreements as being rough drafts, did you?

A. No.

Q. Okay. You mentioned that there were flight logs that were submitted. Are you referring to due diligence that was done before the purchase of the second plane or after the purchase?

A. Primarily after. The bank every year will -- they make a site visit where they inspect the plane just to make sure the asset's still there, it still exists. And they'll also review our flight logs. They'll meet with me to discuss financial statements. They'll look at our tax returns. Every year we need to update their files on all those documents and things.

Q. Did the bank get any information from you or others with respect to the lease payments?

A. Yes.

Q.   Did the bank see lease payment calculations?

A.   Yes.  The bank reviewed all of those documents, all the financial records.

Q.   Well, if you could just -- just so we have a very clear record here, if you could look at Plaintiff's Exhibit No. 11.  Is that document, which is the flight log that's been discussed here -- was that provided as part of the post-purchase due diligence?

A.   When they requested of me the flight logs, I'm not certain that they got these flight logs or the flight logs directly from the pilot, because they communicated with myself and also with the pilot, because the pilot is the person who's in charge of maintaining the records for the aircraft, so he would have the official flight logs.  So I'm pretty certain that they would have gotten the official logs and not the summary here that was prepared by Advocate.

Q.   Are you suggesting, just to clarify, that Wells Fargo was actually speaking with the pilot as part of the post-acquisition due diligence?

A.   More than likely they did just to get the flight logs, because I didn't have possession of the flight logs.  They would have had to have gotten them from them.

Q.   If you could turn to Plaintiff's Exhibit 12,

# Reporter's Record Volume 5 Reply Reference

5 RR 13

5 RR 13-14

5 RR 19

5 RR 20-21

5 RR 21

5 RR 30

because we don't -- I don't want to take the risk to lease to somebody that I'm not involved in.

Q.   Let's talk about that.  As I understand it, you only lease to related entities.  And -- and when I say 'you,' I'm referring to Cantu Enterprises or Cantu Consulting.

A.   That's correct.

Q.   Okay.  And the reason, as I understand it now, is that you don't want to take on the risk of unrelated third parties damaging the aircraft.

A.   That and also the liability.

Q.   And what do you mean by 'the liability'?  What are -- what are your concerns with regard to that aspect?

A.   Basically mostly hearsay, but I've heard about airplane accidents and then you get sued and all kinds of stuff.  So one of the things that -- when I considered buying the plane, the person that sold it to us said, 'You need to hire a consultant to keep track of all the compliance that goes along with the FAA and the planes and then get insurance,' and all kinds of stuff.  And I felt so concerned about the liability that I --

THE REPORTER:  I'm sorry.  'And I' ...

THE WITNESS:  I felt so concerned about the liability that I doubled what they were proposing as

far as liability insurance. And we also set it up into entities to protect me from any liability, if anything ever happens on the plane or the passengers.

Q. Okay. And the -- the two entities that you're referring to, I believe, are Cantu Enterprises and Cantu Consulting; is that correct?

A. Yes. Yes, sir.

Q. Are there any other of your entities that are tasked with management or the business affairs of the aircraft?

A. No.

Q. Would it surprise you to learn that the Secretary of State documents indicate that the sole member of Cantu Consulting is Cantu Enterprises?

A. No. Again, that goes, in my opinion, for compliance. And that's maybe the recommendation from the consultants, but I -- I don't know.

Q. Okay. Do you have any day-to-day operations with Cantu Consulting?

A. Not day-to-day.

Q. How would you characterize your involvement with Cantu Consulting?

A. I want to make sure everything is done right, compliant, and legal.

Q. And do you do any of the accounting for Cantu

aircraft that's the subject of this lawsuit?

A. Convenience and flexibility for my companies to grow and to be able to do business quicker.

And then also I'm looking at other ventures in leasing. So I think this one I've learned how the leasing process works and then through the -- through the -- through the plane, through the airplane, I mentioned a while ago that I just bought a ranch and I want to do some leasing there also.

Q. You identified a few objectives in your purchase of the subject aircraft, one of which was convenience. Can you --

A. The first one would -- convenience, yes.

Q. Okay. Would -- would you characterize that as the -- the most important objective of your purchase for this -- of this aircraft?

A. No. My most important would be how important it is for my business. I mean, convenience for me. I can take commercial, but sometimes we have to be in Austin the next morning or this afternoon or -- so that -- that -- and then in the last few years we've opened up branches of the bank in San Antonio. And we want to go to Houston also. So with that into consideration, everything involved, and my only thought was just to make sure we're protected from the liability

of an accident.

Q.   And so correct me if I'm wrong, but it sounds to me like you need to be able to use the aircraft on a moment's notice.

A.   Yes, but that's never happened.  I usually like to leave -- give my pilots, you know, a week or more notice because they -- they live in Brownsville.

Q.   Should the need arise, you would need to have ready access to the aircraft at a moment's notice; is that correct?

A.   That's correct.  The -- the pilots are supposed to be on call; but in all the years we've had a plane, we've never had a situation like that.

Q.   You referenced flexibility as one of the objectives of your purchase of this aircraft.  Can you provide a little bit more detail for the Court about what you mean by 'the flexibility of the aircraft'?

A.   Well, flexibility on my time and the fact that the plane is available.  There's been times that I've had a meeting in Houston and I had to have -- be in Austin or San Antonio in the afternoon.  So there's no way I could have flied commercial and do all that.

Q.   Okay.  And do you know when you fly in the aircraft who -- what business is operating that -- that aircraft?

A.    Definitely.

Q.    Which business would that be?

A.    Well, there's several businesses.  It would be Cantu Construction, the hospital, the bank, the Vipers, Lone Star Litho.  And, I don't know, I think that's it. There might be one or two others.

Q.    Has there ever been an occasion where you needed to use the aircraft but someone in a related business was using it and you then were unable to use the aircraft?

A.    No, because we really don't fly that much.

Q.    And would you say that you, Alonzo Cantu, have priority over any other people in your organization that need to have access to the aircraft?

A.    I would say yes, but I don't -- I don't fly that much.  In fact, I -- I personally fly maybe less than 10 percent of the time for personal reasons, personal uses.  So my time is scheduled way ahead of time.

Q.    Okay.  And so you do use the aircraft for personal uses; is that correct?

A.    Yes.

Q.    What sort of personal uses do you use the aircraft for?

A.    I go to Houston.  I've gone to College Station

A. Well, whatever entity uses the plane would be my -- I mean, that's normally how it's done because I get the bill. When I use it, they send me a bill; I pay for it.

Q. Okay. But as far as compliance with the terms in the contract, you're unfamiliar with that; is that -- is that correct?

A. Compliance, you mean the amount or --

Q. Compliance as in in order to comply with the terms --

A. Oh.

Q. -- of any agreement.

A. That's Rene's responsibility."

MR. SIGEL: Page 47, Line 5 through Line 11.

Q. "Okay. Now, Mr. Bolson asked you some questions about your personal objectives with respect to these aircraft. And you talked about convenience and wanting to have a plane available. I guess as a follow-up, what was the objective of Cantu Enterprises, LLC in buying the aircraft?

A. Strictly business, leasing."

MR. SIGEL: That concludes those excerpts.

THE COURT: You may step down.

MR. CHRISTIAN: Thank you, Your Honor.